IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PAUL PAYNE,

       Petitioner,

v.                                        CIV 07-1017 MCA/KBM

TIM LeMASTER, Warden, et al.,

       Respondents.

# FINAL PROPOSED FINDINGS
## &
## RECOMMENDED DISPOSITION

After presiding District Judge Armijo adopted my preliminary proposed findings on timeliness and exhaustion, the federal record was expanded. *See Docs. 19-26, 33-36.* This matter is now before the Court on Paul Payne's petition for habeas relief under 28 U.S.C. § 2254 and supplemental pleadings, *see Docs. 1, 13, 14, 37,* as well as the State materials Respondents filed.

The State materials include the Record Proper, transcripts of *voir dire* and trial, trial exhibits, and tapes of some of the other hearings. *See Docs. 24, 26, 33, 36.* The direct appeal and State postconviction documents are part of the Record Proper but are not Bates-stamped. Accordingly, unless otherwise noted, all citations to these documents are the Exhibits attached to Respondents' Answer. *See Doc. 12.* Although there are still a few items from the State

criminal proceedings that have not been submitted for the federal record, I find their absence immaterial.

Because Payne filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case. *E.g., Johnson v. Mullin,* 505 F.3d 1128, 1133 (10th Cir. 2007), *cert. denied,* 128 S. Ct. 2933 (2008). All of the issues can be resolved on the record before me and, therefore, an evidentiary hearing is unnecessary. *E.g., Trice v. Ward,* 196 F.3d 1151, 1159 (10th Cir. 1999), *cert. denied,* 531 U.S. 835 (2000); *see also* Rule 8(a), RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS.

I recommend that Payne's claims be denied as without merit and that this action be dismissed with prejudice.

## I.  Brief Factual & Procedural Overview[1]

Both Payne and his codefendant John Price were inmates housed in the administrative segregation unit of the Lea County Correctional Facility. The unit has two sides – "A" and "B," which are separated by a fence that runs the length of the first floor. Stairs to reach the upper tiers are located at one end of the unit on either side of the fence. Both sides have a lower and an upper tier of cells, and the outer edge of the walkways in front of the cells are lined with another chain-link fence. Normally, three correctional officers are assigned to the unit. One officer is assigned to the "picket," which is the room that houses the controls for opening cell doors and other equipment. The other two officers deal with the prisoners.

---

[1] Citations for this overview section include: *Exh. E* at 2-13; *Exh. F* at 1-3; *Trial Transcript; State Trial Exhibits* 15, 16, 19; *Defense Trial Exhibits* F, G. The murder was suspected to be gang-related and carried out when the unit happened to be understaffed, with an inexperienced person working the controls for opening and closing cell doors. *See, e.g., Record Proper* at 419-512, 681-740.

Payne and Price had jobs as laundry porters, and on June 17, 1999, they were carrying out their duties.  They were the only inmates out of their cells – all of the other inmates were in their cells behind locked doors.  Instead of the usual three officers, only two correctional officers were on duty that day.  Officer Carla Flores was working the picket and Officer James Phillips was responsible for the inmates.  Both officers were in the picket when someone called out for cell B-205 to be opened.  Inmate Richard Garcia resided in B-205.

Inmates are not permitted in another inmate's cell and the picket officer is not to open cell doors for inmates.  Nevertheless, Officer Flores opened the door.  Officer Phillips saw Payne and Price standing outside Garcia's cell and saw them enter the cell when the door opened.  A ruckus ensued and the sprinkler in Garcia's cell went off.  Officer Phillips made efforts to reach the cell, but before he got there, he saw Payne and Price leaving Garcia's cell and moving down the walkway toward their cells.  Someone said:  "White power."  When Officer Phillips reached the cell, he found Garcia hanging off the bunk and water flooding the cell.  Garcia had suffered extensive stab wounds that soon proved to be fatal.

Both Payne and Price were indicted for the murder, and Price pleaded guilty. Following extensive *voir dire*, Payne agreed to waive a jury trial, and the State agreed to drop the death penalty.  The matter was tried to the Honorable William P. Lynch.  As I noted in my prior findings, Judge Lynch found Payne guilty of "first degree murder, conspiracy to do the same, and possession of a deadly weapon by a prisoner." *Doc. 19* at 7.  He sentenced Payne to life imprisonment plus nine years followed by five years parole, and imposed this sentence consecutively to a sentence that had been imposed in another case for Payne's escape from

prison.  *Id.*[2]

## II.  AEDPA Standards Of Review

Payne's federal petition contains fourteen numbered issues that in turn contain multiple overlapping and interrelated claims, the bulk of which raise claims of ineffective assistance of trial and appellate counsel.  *See Doc. 1* (hereinafter "*Petition*").  It does not expressly include the sufficiency of the evidence claim to all counts rejected by the New Mexico Supreme Court on direct appeal.[3]  It does, however, include the Confrontation Clause challenge to the use of Officer Phillips' preliminary hearing testimony during trial that the court also rejected.  *See Exh. H.*

Payne pursued his breach of "plea" agreement claim postconviction by way of a motion to withdraw his waiver of jury trial.[4]  Ultimately, District Judge Ralph D. Shamus rejected that

---

[2]  I also noted that Judge Lynch took the federal bench as a Magistrate Judge in April 2005 and because he was randomly assigned this case at the outset, it was transferred to me.  Judge Lourdes A. Martinez presided over the escape trial in "99-46," and she took the federal bench as a Magistrate Judge in May 2003.  *Doc. 19* at 7, nn. 7-8.

[3]  When a life sentence is imposed, the direct appeal is filed in the New Mexico Supreme Court instead of the New Mexico Court of Appeals.  *See, e.g., State v. McClaugherty*, 133 N.M. 459, 461, 64 P.3d 486, 488 (N.M. 2003); N.M. CONST. art. 6, § 2; N.M. R. APP. P. 12-102(A)(1).

[4]  The documents associated with this issue are not Bates-stamped, but appear in Volume 5 of the record proper and are:  (1) August 28, 2003 "Court's Order on Stipulation of the Parties;" (2) May 4, 2004 *pro se* "Motion to Withdraw Conditional Waiver of Jury Trial, and Motion to Transport Petitioner to New Mexico" and attachments thereto that include a 1/5/03 letter to Payne from Annie Hobbs and 2/13/04 letter to Wayne Freestone from Warden Clint S. Friel; (3) June 16, 2004 *pro se* "Document in Support" with attached prison "C-Notes;" (4) July 13, 2004 Clerk's Memo re:  7/6/04 status conference; (5) July 19, 2004 another *pro se* "Document In Support" that attaches 6/23/04 letter to Payne from Annie Hobbs and 5/31/03 letter from Jane Burson to Ann Hobbs; (6) August 3, 2004 "State's Response To Defendant's Motion To Withdraw Conditional Waiver of Jury Trial" with attachments 11/5/03 letter from Scott Thompson to Annie Hobbs, 10/9/03 letter from Ronald G. Limbeck to Annie Hobbs, 7/26/04 letter from Brian Scott Stover to Annie Hobbs, 7/26/04 letter from Brian Scott Stover to Gilbert Garcia; and (7) August 5, 2004 *pro se* "Addendum."

claim. *See Exh. K.* Payne's subsequent State habeas petition raised most, but not all, of the other claims raised in the federal petition. *See Exh. J* at 1-25. Judge Shamus denied the petition in an order that only addresses the ineffectiveness claims and does so in a general way. *See Exh. L.*

Under AEDPA standards, if a state court addresses a claim on the merits, a federal court cannot grant an "application for a writ of habeas corpus" unless the State decision was (1) "contrary to" or an "unreasonable application" of "clearly established" Supreme Court precedent or (2) an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The Supreme Court and Tenth Circuit have discussed these deferential AEDPA standards in detail in many opinions and I will not reiterate them here.[5] These standards apply to decisions on the merits regardless of whether the State opinion is conclusory.

Furthermore, even a federal habeas court finds that the State court decision was "contrary to" or "unreasonable" and a violation of constitutional dimension, habeas relief may not issue unless the violation is of a sort that warrants such relief. *E.g., Terry Williams v. Taylor,* 529 U.S. 362, 374-75 (2000); *Wilson v. Sirmons,* 536 F.3d 1064, 1073 (10th Cir. 2008). Finally, when a claim that is raised for the first time in federal habeas is "easily resolvable against the habeas petitioner," the court may deny the claim on the merits. *E.g., Lambrix v. Singletary,* 520 U.S. 518, 525 (1997); 28 U.S.C. § 2254(b)(2).

---

[5] *E.g., Panetti v. Quarterman,* ___ U.S. ___, 127 S. Ct. 2842, 2858-59 (2007) (and cases cited therein); *Fry v. Pliler,* ___ U.S. ___, 127 S. Ct. 2321, 3326-27 (2007) (same); *Wilson v. Sirmons,* 536 F.3d 1064, 1073-74 (10th Cir. 2008); *House v. Hatch,* 527 F.3d 1010, 1018(10th Cir. 2008); *DeLozier v. Sirmons,* 531 F.3d 1306, 1319 (10th Cir. 2008); *Johnson v. Mullin,* 505 F.3d 1128, 1133 (10th Cir. 2007), *cert. denied,* 128 S. Ct. 2933 (2008).

# III.  Analysis

Payne's federal petition contains fourteen numbered issues that in turn contain multiple overlapping and interrelated claims.  I have construed the claims liberally, arranged them topically, and categorize and analyze them under the proper legal theories based on the facts he asserts.  *See, e.g., Roman-Nose v. New Mexico Dept. of Human Servs.*, 967 F.2d 435, 437 (10th Cir. 1992); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

## A.  Waiver Of Jury Trial

At the beginning of *voir dire*, the State was still seeking the death penalty.  Before Payne waived his right to a jury trial, more than one hundred potential jurors were called and questioned.  They were called in panels of twelve, questioned by the judge as a group, and then questioned individually by counsel and the court privately.  *See Voir Dire Transcript* at 1-1546.  In Claim 9, Payne asserts that the "fundamental reason" he waived a jury trial was because the prosecutor engaged in "misconduct" during *voir dire*:

> the DA continually asked the prospective jurors during voir dire if they would be biased if Petitioner refused to testify on his own behalf.  Some of the jury in 12 man voir dire would say stuff like 'yeah, I'd think he had something to hide' or 'If he was innocent he would testify' all in the presence of other prospective jurors.  Counsel refused to make objections.

*Petition* at 12.[6]

---

[6]  In his State habeas petition, Payne also attributed his waiver of jury trial to his own attorneys and Judge Lynch.  *See Exh. J* at 9 (Ground 5:  "during the course of the case at hand, I had endured such strain and conflict with my attorneys and overwhelming proof of their failure to prepare a defense . . . that I ended up doing a conditional waiver of my right to jury trial.  I was jaded with the process and those involved and resigned myself to the fact that I would ultimately have to pursue this on habeas due to the judges denial of my request to have access to a law library, paralegal, and investigator when he granted my motion to proceed pro se . . ."); *id.* at 10 ("Another fundamental reason for my waiving a jury trial was that

This claim fails for several reasons, none the least of which are the factual inaccuracies in the assertion.  For example, the line of inquiry was not pursued exclusively by the prosecutor.  On different occasions, either the prosecution, the court, or defense counsel were the first to introduce the subject with a particular witness.[7]  They did so because of a question that defense counsel requested be submitted to prospective jurors:  "The Constitution says a person accused of a crime does not have to testify on his own behalf.  How do you feel about this Constitutional right?"  *Record Proper* at 138.  This was included as Question 43 in the questionnaire that the jurors received.[8]  Counsel thus had no reason to object to the prosecutor's inquiry about a prospective juror's responses to the question.[9]

Moreover, the prosecutor did not "continually" ask about the right to testify.  Out of 102 jurors individually questioned, only 13 were asked.  Nor were the jurors asked this question in the presence of the other jurors – they were asked during individual *voir dire*.  *See Voir Dire*

_____

the DA continually asked the prospective jurors during voir dire if they would be biased if I refused to testify on my own behalf.").

[7] *See Voir Dire Transcript* at 148 (prosecutor); *id.* at 167 (prosecutor); *id.* at 302 (defense); *id.* at 473 (defense); *id.* at 498 (defense); *id.* at 501 (court); *id.* at 746 (prosecutor); *id.* at 1052 (court); *id.* at 1076 (court); *id.* at 1138 (prosecutor); *id.* at 1160 (court); *id.* at 1331 (court); *id.* at 1344 (court); *id.* at 1472 (court).

[8] *See Tape Log 12/18/00* at 13 (motions hearing before Judge R.W. Gallini included defense motion for questionnaire, taken under advisement); *Record Proper* at 612 (same); *id.* at 1061 (notice by Judge Lynch that the jurors have received questionnaires); *Voir Dire Transcript* at 148, 1076 (identical question included in questionnaire as number 43).

[9] *See Harjo v. Gibson*, 2000 WL 796091 at *6 (10th Cir. 2000) ("Possibly implicating a constitutional right, petitioner argues counsel should have objected to the prosecutor's comment that 'the Court has told you our burden is to prove our case beyond a reasonable doubt.  The Court told you that doesn't mean beyond a shadow of doubt or beyond all doubt or one hundred percent certain just said beyond a reasonable doubt.' . . .  On direct criminal appeal, the Oklahoma appellate court concluded the prosecutor repeated the trial court's explanation of reasonable doubt. . . .  This determination was not unreasonable.  Thus, counsel's failure to object was not prejudicial."), *cert. denied*, 532 U.S. 1024 (2001).

*Transcript* at 148-49, 167-74, 302-04, 473-74, 498-502, 746-48, 1052-53, 1076-79, 1138-40, 1160-64, 1331-33, 1344-46, 1472-87.[10]  In fact, it was the defense who ensured at the outset of *voir dire* that questions about the burden of persuasion and the right not to testify would only be discussed in individual sequestered *voir dire.  See id.* at 18.

To the extent that Payne is suggesting that simply mentioning a defendant's Fifth Amendment rights during *voir dire* is prosecutorial misconduct, he is mistaken.  "The mere mention of petitioner's rights is not *per se* prohibited; rather, it is the prosecutor's exploitation of a defendant's exercise of his right to silence which is prohibited."  *Pickens v. Gibson,* 206 F.3d 988, 998 (10th Cir. 2000) (internal quotations and citation omitted).  Here, as in *Pickens,* the prosecutor's statements "accurately reflect the law."  *Id.*  In addition, the prosecutor did not exploit Payne's Fifth Amendment right in any way because the juror's views on this subject was a proper line if inquiry during *voir dire.*  The "underlying purposes of *voir dire*  [are] to seat an impartial jury and to facilitate the appropriate exercise of peremptory challenges."  *Neely v. Newton,* 149 F.3d 1074, 1084 (10th Cir. 1998).  As such, a "suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried."  *Id.* (internal quotations and citations

---

[10]  New Mexico requires individual *voir dire* on "death penalty issues" but also allows the court to "permit individual sequestered voir dire of prospective jurors on other issues."  N.M. Rule 5-704(D).  Early rulings in the case were going to have *voir dire* proceed in groups of six or twelve, but those decisions were reversed before trial.  *See, e.g., Record Proper* at 931-32, 941, 1120-31; *Pretrial Hearing Transcript* at 6-12.  The only person who questioned the twelve-member panels of jurors collectively was Judge Lynch, and he only covered the general topic of whether the jurors knew the attorneys, victim, counsel or their families.  The rest of the questioning was conducted with each juror individually and outside the hearing of the others.  *E.g., Voir Dire Transcript* at 21-27, 191-96, 348-55, 534-43, 559-67, 722-28, 925-30, 1117-22, 1275-80, 1434-40.

omitted).[11]  Indeed, of the thirteen who were questioned about their responses to Question 43,

six were excused for cause.  *See id.* at 919-20, 1112-13, 1164-65, 1261-62, 1428, 1545.

Since the prosecutor did not impermissibly comment on or exploit Payne's Fifth

Amendment rights, to warrant habeas relief the prosecutor's remarks must have "so infected the

trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v.*

*DeChristoforo,* 416 U.S. 637, 643 (1974).[12]  And, even if there were a constitutional violation due

---

[11]  The Tenth Circuit in *Pickens* cited a Fifth Circuit case that held:

> A prosecutor's statements regarding a defendant's failure to testify made
> after the introduction of evidence may violate the Fifth Amendment.  *See*
> *United States v. Johnston,* 127 F.3d 380, 396 (5th Cir. 1997).  During voir
> dire, however, before the introduction of any evidence, the prosecution
> may attempt to determine if a prospective juror will be prejudiced against
> the state by the absence of live testimony from the defendant.  *See*
> *Campos v. State,* 589 S.W.2d 424, 426 (Tex. Crim. App.1979) (stating
> that because the state's counsel had no way of knowing whether the
> defendant would testify, it was not necessarily error to comment on the
> defendant's potential failure to testify during voir dire) . . .  This is a valid
> area of voir dire inquiry under Texas law as a prospective juror should be
> told what the law is before being excused for bias or prejudice against that
> law. . . .  Under *Strickland,* therefore, the failure of Green's counsel to
> object was not deficient because the prosecution's line of questioning was
> proper.  Green alleges no facts suggesting that he was prejudiced.

*Green v. Johnson,* 160 F.3d 1029, 1038 (5th Cir. 1998), *cert. denied,* 525 U.S. 1174 (1999).

New Mexico cases and statutes do not prohibit inquiry into jurors' views on the Fifth Amendment
right not to testify.  *See* N.M. Rule 5-606(A) ("The court may permit the parties or their attorneys to
conduct the examination of prospective jurors or may itself conduct the examination.  In the latter event,
the court shall permit the parties or their attorneys to supplement their examination by such further
inquiry as it deems proper, or shall itself submit to the prospective jurors such additional questions of the
parties or their attorneys as it deems proper."); N.M. Rule 5-704(D) (*voir dire*  in death penalty cases).

[12]  It is true that the Tenth Circuit did grant habeas relief in a case where the prosecutor made
remarks about the presumption of innocence during *voir dire,* but that case is readily distinguishable.
There, prosecutor's remarks were particularly improper and egregious – the presumption of innocence
no longer existed.  The remarks were made in front of the entire jury panel during *voir dire* and were
repeated during closing argument, but the trial court's instructions failed to correct the misimpression.  *See*
*Mahorney v. Wallman,* 917 F.2d 469 (10th Cir. 1990).

to the prosecutor's question, "as with any constitutional error, we must still review for harmlessness." *Hamilton v. Mullin*, 436 F.3d 1181, 1190 (10th Cir.) (citing *Pickens*, 206 F.3d at 998), *cert. denied*, 127 S. Ct. 560 (2006).

Payne's assertion of causation – that he waived a jury because of alleged harm due to prosecutorial misconduct – is not supported by the record for two reasons. First, Payne agreed to try the case to the bench *before* jury selection concluded and when confronted with only a very small number of prospective jurors who were asked about Question 43. After challenges for cause, only seven such prospective jurors remained. Of those seven, the defense only challenged four of them. *See id.* at 186-87, 187-88, 332-338, 531-32, 498-502, 533, 1076-79, 1115, 1138-40, 1265. Thus, to select a petit jury, at most the defense may have had to exercise four of the 20 peremptory challenges it had been granted. *See id.* at 190, 339, 533, 718, 921, 1115, 1265, 1430, 1546; *see also Record Proper* at 141, 634. This few a number is not sufficient to find "unfairness" or "harmfulness," either under a deferential standard or *de novo* review.

Second, the transcript actually shows that the reason why Payne waived a jury trial had nothing to do with the prosecutor's inquiry about Question 43. This brings me to Payne's Eighth claim.

## B.  Breach of "Plea" Agreement

Payne asserts that in exchange for his agreement to waive the jury, the State not only agreed to not seek the death penalty but also agreed to transfer him and another inmate – John Brunner – to "any state of their choice but not Utah or New Mexico." *Petition* at 11.  He also asserts that because he was never transferred out of Utah and because Brunner was never

transferred out of New Mexico, his "plea" agreement was breached, thereby violating his Sixth Amendment right to a jury trial.  *See id.* at 11-12.[13]

Payne raised this claim by way of a *pro se* motion to withdraw his jury trial waiver.  There he asked for inconsistent relief.  He not only asked that the "waiver" of jury trial be "set aside," but also sought specific performance of the transfer agreement.[14]  Judge Shamas denied the motion based on his determination that a guaranteed transfer was not part of the bargain – the only promise made by the State was that attempts would be made to accommodate the inmates'

---

[13]  Toward the end of the first week of individual *voir dire,* the parties and Judge Lynch discussed the possibility of an "alternative" resolution to the case.  The parties continued discussions over the weekend.  *See Voir Dire Transcript* at 1548-150.  On the following Monday, they informed Judge Lunch that they had discussed "if the State would drop the death penalty, the Defense would waive a jury pursuant to some other demands by Mr. Payne."  *Id.* at 1550.  The other demands were that Payne and another inmate friend of his be transferred to prisons outside New Mexico:

> [Defense Counsel] MR. BUCKELS:  [The other demands are] that in the event of a conviction, that Mr. Payne would be transferred out of state and preferably to the Wyoming system or another system that shares its characteristics.
>
> And the important characteristics are that it not be New Mexico, first of all, that it be as much as possible a state contiguous to Colorado because that's where his mother lives, and that it not be a system that has gang problems, which it's our information Wyoming does not.  It's probably not the only state that fits that description.  Montana probably would.  Idaho probably would.  But the one that would be the most – that would make it easiest for Mr. Payne's mother to visit him would be Wyoming.
>
> And the second thing was that Mr. Payne's friend from Utah, John Bruner, who was incarcerated at PNM North, be transferred out of state anywhere.

*Voir Dire Transcript* at 1550-51.

[14]  *See Record Proper* (Vol. 5, not Bates-stamped, document filed 5/4/04 – "Motion to Withdraw Conditional Waiver of Jury Trial"); *id.* (document filed 6/16/04 – "Document in Support"); *id.* (document filed 7/13/04 – Clerk's Memo showing that at telephonic conference with Judge Lynch where Payne was present and represented by counsel, parties focused on transfer issues for Payne and Brunner); *id.* (document file 7/19/04 – another *pro se* "document in support" asking that the waiver "be set aside and this case sent back to pretrial status"); *see also Santobello v. New York,* 404 U.S. 257, 263 (1971)(possible remedies include specific performance or withdrawal from plea).

transfer wishes.[15]

Regardless of whether his decision should be considered a mixed question of law and fact, or a purely factual issue, the outcome is the same under AEDPA.  *See Battenfield v. Gibson,* 236 F.3d 1215, 1231 (10th Cir. 2001) ("We find it unnecessary to definitively characterize the waiver as either a factual issue or a mixed question of fact and law").  Judge Shamas' approach was to determine what the terms of the "contract" were to see if a breach occurred.  There is no Supreme Court authority, much less clearly established authority, concerning the proper inquiry

---

[15]  He stated:

> While the Defendant calls his agreement a "conditional" waiver, there is nothing to suggest that his decision to waive jury was conditioned on any actual promise other than the State's agreement not to pursue the death penalty. . . .  The problem with the Defendant's position . . . is that he was never promised he would be incarcerated in some State other than New Mexico or Utah.

> The proceedings and the discussions that were had . . . make it absolutely clear that the Defendant and his counsel were aware that the State could not promise that the Defendant would be imprisoned in some State other than New Mexico or Utah.  While there were a number of telephone calls made that morning in an attempt to secure some firm deal on the issue, the last telephone discussions with the New Mexico Department of Corrections resulted in the prosecuting attorney, Melissa Honigman, advising the Court, in the presence of the Defendant and his counsel, ". . . they will attempt to place Mr. Payne out of state on an interstate compact"  She went on to say to the Defendant, on the record, ". . . the Utah Department of Corrections will try to place you in three other states." . . .  There was no specific agreement to do anything other than to try, and to request, and there was no room for a misunderstanding to the extent now claimed by the Defendant.

> * * * * *

> . . . There was no promise that he would be moved from Utah to some State other than New Mexico.  It was only said that an attempt would be made, and that New Mexico would request that Utah act to transfer the Defendant.  These things were done, and the requests were denied by reason of the Defendant's own conduct. . . .  [m]otion . . . denied.

*Exhibit K* at 1-2 (emphasis original). The Supreme Court of New Mexico denied certiorari without explanation after ordering the State to respond the counseled appeal.  *See Exhs. O-R.*

12

for evaluating alleged breaches of jury waiver agreements.  This alone ends the "contrary to" prong of AEDPA.  *See House v. Hatch,* 527 F.3d 1010, 1018(10th Cir. 2008) (after the Supreme Court's decision in *Carey v. Musladin,* 549 U.S. 70 (2006), the "absence of clearly established federal law is dispositive under

§ 2254(d)(1)" on both the "contrary to" and "unreasonable" issues). Nevertheless, Judge Shamas' decision was also consistent with federal law.

The standards for a valid waiver of a jury trial and entry of a plea are the same.  *E.g., Brady v. United States,* 397 U.S. 742, 748 & n.6 ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."); *Adams v. U.S. ex rel. McCann,* 317 U.S. 269, 277-78 (1942)(same, jury trial).  The inquiry for breaches of plea agreements has been extended to other areas of prosecutorial promises.[16]  That is, there is no relief unless the promise at issue was "material" and, "[a]s in contract, the terms of a plea agreement and their relative materiality are

---

[16]  It has been extended, for example, to claims that the prosecutor failed to abide by a promise of immunity from prosecution.  *E.g., United States v. Crobarger,* 158 Fed. Appx. 100, 104 (10th Cir. 2005) ("The Supreme Court has ruled that 'when a [defendant's guilty] plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.' *Santobello v. New York,* 404 U.S. 257, 262 (1971).  This court later held that a cooperation agreement between a prosecutor and an inmate in connection with a methamphetamine investigation unrelated to the inmate's original conviction was "analogous to a plea bargain and therefore that the same analysis applies to both types of agreements."  *United States v. Pinter,* 971 F.2d 554, 557 (10th Cir. 1992) (internal quotation and alteration omitted)"); *United States v. McBride,* 571 F. Supp. 596, 616 (D. C. Tex. 1983) ("The courts have asserted the public interest in holding the government to its word in cases of agreements not to prosecute which were entered fairly.  In *Rowe v. Griffin,* 676 F.2d 524, 528 (11th Cir. 1982), for example . . . the Eleventh Circuit enjoined the prosecution of defendant by the state and stated that the contractual analysis utilized in *Santobello* "applie[d] equally well to promises of immunity prosecution when such a promise induces a defendant to waive his fifth amendment rights by testifying . . . or to otherwise cooperate with the government to his detriment, due process requires the prosecutor's promise be fulfilled.").

evaluated by an objective standard." *Rodriguez v. State of New Mexico,* 12 F.3d 175, 175-76 (10th Cir. 1993) (internal quotation marks and citations omitted).  Put another way, the inquiry is to ascertain "the nature of the [prosecutor's] promise" and "the defendant's reasonable understanding of the promise at the time" he waived the jury.  *United States v. Peterson,* 225 F.3d 1167, 1170-71 (10th Cir. 2000).  Because Judge Shamas' approach was to determine what the terms of the "contract" were, his decision is not "contrary to" clearly established Supreme Court precedent within the meaning of AEDPA.

Moreover, Judge Shamas' conclusion that the only "promise" was to make attempts to transfer was a reasonable determination of the facts.  The *voir dire* transcript fully confirms his conclusion.  Though it was clear that a transfer was of great concern to Payne, the ultimate agreement was that corrections departments in New Mexico and Utah were willing to work with him to try to secure a transfer to another state.  The success of those endeavors, however, was entirely dependent on the other state accepting him, and there were no guarantees that would happen or, if he was transferred, that he would not be transferred back for some reason.

For example, though the prosecutor did not object to the transfer demands, it could not guarantee a transfer because "these are things that are totally out of our control."  *Voir Dire Transcript* at 1551.  When Judge Lynch reported about his conversation with the New Mexico Department of Corrections, he specifically highlighted the difficulty in guaranteeing that Payne would never again be incarcerated in New Mexico:

> THE COURT:  You know, as is probably no surprise, DOC didn't have an answer right now.  I told them what our working parameters were.  Um, they're going to check and see whether this can be done.
> Um, first off, you know, he told me, look, this isn't in our

14

control, you know.  Then he said, well, you know, we could try to get this done, we could try to make this work.  But he said there could be some problems in the sense that if – if we move Mr. Payne and he then acted up on another state, then the other state might say take him back.  I mean, they would be obligated to take him back.  If they sent him to, you know, wherever, Wyoming, Montana, Idaho, and Mr. Payne had medical problems they didn't want to pay for, they might say take him back.

On John Brun[n]er, he didn't think there was a lot they could do, other than they might be able to send Burner back to Utah.  You know, they weren't entirely sure.  So they're checking.

He'll – he's going to call me.  You know, D'Angelo doesn't have the authority by himself.  He's just the attorney.  So he's going to check and see.  And I should have an answer, you know, within 30 minutes, I hope.  You know, it may be that in 30 minutes I won't have a definitive yes or know.  *They may say, look, we'll make our best efforts* to move Mr. Payne and move Mr. Brun[n]er, you know.

And I don't know if that's acceptable to you guys.  But, I mean, that's – I'm just telling you, you know, um, I don't know that we'll have the final answer – and I don't mind holding the jury until 9:00.  I mean, that doesn't really bother me that much past that.  In fact, you know, we should talk whether I should tell – just go out and tell the jurors, ladies and gentlemen, we're working this morning, I'm sorry for the delay, you know, please don't think we're not working on this.

MR. BUCKELS:  Judge, as far as the medical and trouble issues, I mean, Mr. Payne will, you know, assume the risk.  And if he goes to Wyoming and misbehaves, then God only knows what will happen to him next.

THE COURT:  *Could get sent back here.*

MR. BUCKELS:  And medical.  And he certainly is confident from a statement made to him by DOC, first of all, that they intended all along to send him out, but –

THE COURT:  Yeah, but it may be that D'Angelo doesn't know this.

MR. BUCKELS:  Well, that could well be.

*Id.* at 1152-54 (emphasis added).

Thereafter, when defense counsel indicated that New Mexico was not the only place of incarceration Payne found unacceptable the prosecutor contacted the Utah Department of

Corrections.[17]   After making contact, she proposed staying jury selection until the matter could

be resolved, but made no indication that a transfer would be guaranteed.[18]  Because Judge Lynch

_____

[17]            THE COURT:  . . . Here's what I've been told that it's likely Mr.
Payne would be going back to Utah because he's initially under Utah
charges.  Now, of course, whenever the Utah time runs, it runs.  Then
he'd be under a New Mexico hold.  He would get brought back here and
– but they would move Mr. Payne out of state at that point. . . . So that
will take care of it, then, to where we can move on?  He won't go to
Utah?
            MR: BUCKELS:  I'm sorry, Judge.
            THE COURT:  Okay.
            MR. EARNEST:  Was there any mention of Mr. Brun[n]er,
discussion about Mr. Brun[n]er?
            THE COURT:  I'm sorry?
            MR.  EARNEST:  Mr. Brun[n]er in your discussions with Mr.
D'Angelo?
            THE COURT:  To be honest, he and I didn't talk about
Brun[n]er this last time.  We just talked about Mr. Payne.  But so – okay.
I didn't – I didn't understand.  I thought it was somewhere out of New
Mexico.  I didn't realizes Utah was not a possibility.
            MR. BUCKELS:  You mean for Mr. Payne?
            THE COURT:  Yeah.
            MR. BUCKELS:  Yeah.  Um, he, um, figures that would be
worse.
            THE COURT:  All right.  I guess we'll go ahead then and we'll
get started with the jury.

*Id.* at 1558-59.

[18]            MS. HONIGMAN:  Your Honor, I have the names of the people
in Utah that I need to call and talk with regarding what they plan on
doing with Mr. Payne and whether or not they're willing to deal with us
in New Mexico regarding sending him to Wyoming, Idaho, Montana, one
of those.  If I could go up to my office and make those calls –
            THE COURT:  Okay.  I'm inclined to tell the jurors again we're
still working on this, to hold tight. . . .
            MR. BUCKELS:  Mr. Payne, you know, wants – point out that
we have to deal with the Brun[n]er issue, too, which I guess is also a Utah
issue.
            MS. HONIGMAN:  Right.
                                    *  *  *  *  *
            THE COURT:  Okay.  Did you have any luck?
            MS.  HONIGMAN:  Actually I did, Your Honor; and I have a
proposal.  But I'll tell the Court, I talked with Mary Hobbs with the Utah

did not want to lose a day of work, he made a counterproposal that Payne simply agree to begin a

bench trial and then wait to see what could be worked out about placement since the efforts

looked promising.  *See id.* at 1573-75.  And he emphasized that even if a placement decision

could not be reached, Payne would benefit from not having the State pursue the death penalty:

> MR. BUCKELS:  [Defense counsel speaking to Payne]
> Um, what if, um the – if you agree to what the judge proposed on
> the condition that he be involved in talking to the officials in
> Utah, as well as Ms. Honigman –
> THE COURT:  I'm willing to do that, to – just like I talked
> to Mr. D'Angelo this morning with the New Mexico DOC.  To the
> extent it makes any difference, I would assist Ms. Honigman in
> talking to the Utah Correctional Facility people to get you placed
> outside of Utah.  That way we don't just lose the whole day, and
> we can start moving forward and – because I assume at some point
> you would like a resolution of your case one way or another.

---

Department of Corrections.  She said that Wyoming is out.  They had to
close down a prison there, and they're housing their prisoners out of the
state.  She needs to go up through her chain of command regarding
Montana, Idaho, or any other state close to Colorado, but they are willing
to work with us.

As far as Mr. Brun[n]er is concerned, she was not aware that Mr.
Bruner wanted to be moved out of New Mexico.  *She said typically first
step is for the prisoner to write her a letter indicating interest in getting
out of whatever state they're in, and that has not happened in this case.
But she would also talk with her supervisors about getting Mr. Bruner
out of the New Mexico system.*

> THE COURT:  And not in Utah.  Is it the same deal –
> MS. HONIGMAN:  Right.
> THE COURT:  – that Brun[n]er doesn't want to go to Utah?
> MR. BUCKELS:  Right.
> THE COURT:  All right.  So are we to a point new where –
> MR. BUCKELS:  Well, Ms. Honigman has a proposal I'd like to
hear.
> THE COURT:  Oh, I'm sorry.  I didn't get to it.  Sure.
> MS. HONIGMAN:  My proposal would be that we release this
jury until tomorrow morning and try to get this [placement issue]
finalized . . . .

*Id.* at 1569-71 (emphasis added).

THE DEFENDANT:  Definitely.

THE COURT:  It's been almost three years.  And so for us to just say, you know, we'd all go back to the motel and she talks on the phone –I mean, we've got witnesses here.  That would be my preference is that we proceed; and if phone calls come in, if it's a trial to the judge, it's not a problem, I take a break, you know. We go – to the extent I need to be involved, *I'm on the phone on Mrs. Honigman's on the phone with these Utah people.*

MR. BUCKELS:  I think the judge is promising to firmly pursue, you know, getting both you and John out of Utah and not in New Mexico, and like, in Idaho, Montana, someplace along the – contiguous to Colorado.

THE COURT:  Yeah.  We know it's not going to be Wyoming because of what we've heard.

MR. BUCKELS:  Yeah.  I'm sorry.

THE COURT:  It's not going to be Wyoming, *but it will be somewhere that it will work.*

THE DEFENDANT:  *I'm agreeable to that.  My only concern is that somehow falls through and then – somehow falls through.  You know what I'm saying?*

THE COURT:  *And it could.  I mean, there are no guarantees in life.*  But, I mean, I just know – and I think it was Mr. Buckels that said this at one time, whether we were on the record or not, the New Mexico Corrections Department does seem to be a little more responsive when they talk to a judge than when they talk to a D.A.  I mean, I think that's just the nature of the beast, you know.  *And I would make my best efforts, just as I have this morning, to assist you.*

*Now, you're right.  It could fall through.  But, I mean, you're getting something; you're giving something up.  You know, if the deal falls through completely, then we've got to have a jury trial and a death penalty.  And if you – if we at least move forward knowing that it might fall through, then you know they're not seeking the death penalty anymore; and that has to of considerable benefit to your piece (sic) of mind, I would think.  It would be to mine.*

MR. BUCKELS:  What do you say, Paul?

THE DEFENDANT:  I'm not opposed to it.  I just hate to – I just hate to give my okay or whatever – not that it's necessary, but I just hate to get involved in it and then have it fall through.

THE COURT:  Well, I think it is important that you give your okay and that you be fully informed.  And so, like I said, there are different ways of proceeding.

18

> And although my preference is that I'd like to let the jury
> go and proceed today, we don't have to do that.  But you
> understand, if it falls through today, then when we start tomorrow,
> then you've got the full – you've got the death penalty hanging
> over your head with no guarantees.
>
> I mean, you know, you could either get the death penalty or
> you could get convicted of first-degree murder and then DOC says,
> well, we just think we'll keep him here, which, you know, that's not
> a very good option for you either.  And so, you know, maybe we
> work our way through this, um, *and get you out of New Mexico
> and out of Utah or maybe we don't.  You know, we can't predict
> the future.*
>
> MR. BUCKELS:  But this way, the way that the judge is
> proposing, you've got him hitting for you.
>
> THE COURT:  Well, I mean, and that's probably our
> maximum leverage with the State of Utah is that I assist Ms.
> Honigman.  You know, if we go tomorrow and, you know, we start
> death penalty and everything, then, of course, I'm out of the
> picture.
>
> I can only be involved in terms of trying to get this, you
> know, worked through as part of a package deal, and I'm willing to
> assist Ms. Honigman if she wants me to and if it would be helpful
> to her in dealing with those people.

*Id.* at 1574-78 (emphasis added).

Payne was not persuaded at that point and wanted to dismiss the jurors to use the rest of

the afternoon to try and work out the placement aspects of the deal.  Judge Lynch was unwilling

to let the jurors go, however, so jury selection proceeded until the call came through from the

Utah Department of Corrections.  *See id.* at 1578-1608.  The result was that it would "try" to

effectuate the transfer, and nothing related by the prosecutor about her conversation or by Judge

Lynch indicated a guaranteed placement before Payne agreed to waive the jury:

> MS. HONIGMAN:  Your Honor, I spoke with Hay[e]s
> Locke, who is the director of the inmate placement for the Utah
> Department of Corrections; and he told me that _they will attempt_
> to place Mr. Payne out of state on an interstate compact, that
> when they do an interstate compact, they choose three states –

19

that he would let Mr. Payne choose the three states that he wished
*to try* to get to on interstate compact and he would apply him for
those three states.

He did tell me that Montana and Idaho are both interstate
compact states, as well as Colorado.  I don't know if Mr. Payne
would want to go to Colorado.  Kansas, Nebraska, and Oklahoma
are also interstate compact states.  So he may want to visit with his
attorneys.

But the Utah Department of Corrections *will try* to place
you in three states.  You can choose the one that you want Utah to
place you in, and their intent is to go interstate compact on you
again.

As far as Mr. Brun[n]er is concerned, Mr. Brun[n]er needs
to contact Annie Hobbs at the Utah Department of Corrections,
write her a letter telling her that he feels that he's in danger in the
New Mexico system, and they'll take him back and they will do the
same with him.  *They'll try* three states on interstate compact, and
he can also pick his three states.

*THE COURT:  It's hard to beat that, Paul.  I don't see*
*how we could beat it.*

*THE DEFENDANT:  I'm agreeable with that.*

THE COURT:  So we've got a deal?  I mean, we were just
waiting on confirmation.  We've got confirmation.

Mr. Payne, if you're comfortable then, the *State waives the*
*death penalty claim, you guys waive your jury demand, and then*
*what counsel just said, it sounds like* Utah's going to work with
you to get you out of New Mexico and out of Utah and, you know,
you can list the three states however you want.  That's up to you,
and we don't need to talk about that at this point.

MS. HONIGMAN:  But I told them I would call them back
this afternoon and let them know what states you're interested in.

THE COURT:  Right.

MS. HONIGMAN:  So if you want to spend the lunch
hour thinking about where you'd like to go – Colorado is a
possibility.

THE COURT:  So we've got a deal then.

MR. BUCKELS:  We've got a deal.

THE COURT:  Okay.  So we can dismiss the jurors and
then start this afternoon, testimony to me?

MR. BUCKELS:  Yeah.

*Id.* at 1608-10 (emphasis added).[19]

———————————

[19]   The same day as the waiver on the record, Payne, counsel, and Judge Lynch signed a general jury waiver agreement, which did not memorialize the transfer discussions:  "I understand that I have a right to trial by jury and that all jurors must agree on my guilty of each crime beyond a reasonable doubt for me to be found guilty.  I understand that once I have made the decision to give up my right to jury trial, I may not change my mind."  *Record Proper* at 1157-58 (June 10, 2002).  The bench trial concluded two days later and Payne was sentenced on June 19, 2002.  *See id.* at 1159-64; *see also Trial Transcript* at 287.  Some six months later, the Utah Department of Corrections informed Payne that, though it was "aware of [his] plea (sic) agreement," it had unable to place him outside of Utah and that he would be transferred back to New Mexico after his Utah sentence expired.  *See, e.g., Record Proper* (Vol. 5, not Bates-stamped; *pro se* motion filed 5/4/04 attaching, among other things, 1/5/03 letter from Hobbs that states: [w]e are aware of your plea agreement (sic) and have made several attempts to house you out of Utah on an Interstate Compact.  You have been denied due to your history while being incarcerated.  You will now be housed in Utah to serve the remainder of your Utah sentence.  After completing your Utah sentence you will be transferred to New Mexico to serve the sentence you have with them."); *id.* (*pro se* document filed 7/19/04 attaching, among other things,  6/31/03 letter from John Brunner's mother stating he is still incarcerated in Santa Fe, New Mexico and asked her to inquire about his transfer due to "the agreement that was made with/for Paul Payne.").

Thereafter, in an evident attempt to memorialize more concretely the terms of the waiver and to assist Payne in his attempts at a transfer with the Utah Department of Corrections, Judge Lynch, defense counsel and the prosecutors signed and entered a more detailed "stipulation" that they had agreed "that, in exchange for the defendant's waiver of a jury trial, the state will dismiss the death penalty as a possible penalty herein and the state will request of the Utah Department of Corrections that, through Interstate Compact Procedures, it transfer Mr. Payne out of the New Mexico prison system and place him in one of the following states in order of preference:  (1) Nebraska, (2) North Dakota, (3) Idaho, or (4) another Interstate Compact state (but not New Mexico or Utah)."  *Id.* (Vol. 5, not Bates-stamped; order entered 8/29/03 at 10:51 a.m.).  Judge Shamas noted this stipulation in his decision and, although Payne did not sign this document, he does not disavow its terms and relied on it.  *See id.* (not Bates-stamped; motion filed 5/04/04).

Payne is still housed in Utah, despite efforts to place him elsewhere, and the correspondence of some of these more recent efforts are also in the record.  *See, e.g., Record Proper* (Vol. 5, not Bates-stamped; *pro se* motion filed 5/4/04 attaching, among other things, 1/5/03 letter from Hobbs to Payne and 2/11/04 letter from Friel to Freestone re: mail); *id.* (*pro se* supporting document filed 6/16/04 attaching, among other things, "1/23/04 C-Notes"); *id.* (Clerk's memo filed 7/13/04 from hearing before Judge Lynch where Payne present by telephone and represented by counsel, recounting efforts made and to be made); *id.* (*pro se* document filed 7/19/04  attaching 1/23/04 letter from Hobbs to Payne and 5/31/03 letter from Burson to Hobbs); *id.* (State Response filed 8/3/04 attaching, among other things, 11/05/03 letter from Thompson to Hobbs, 10/9/03, letter from Limbeck to Hobbs,  and 7/26/04 letters from Stover to Hobbs and Garcia); *id.* (Vol. 6, not Bates-stamped; *pro se* document filed 11/8/04 attaching, among other things 6/23/04 letter from Hobbs to Payne) *id.* (Clerk's memo filed 11/8/04 from second hearing before Judge Lynch where Payne present by telephone and represented by counsel, recounting efforts made and setting another hearing for later date); *id.* (*pro se* addendum filed 4/4/05 attaching, among other things, 3/2/05 letter from Ford to Payne).  The New Mexico inmate locator website does not show a "John Bruner" or

Finally, even if I review the claim independently, it still fails. I find that breach of a promise of a transfer is not objectively "material" given the prosecution's agreement to waive the death penalty if Payne waived the jury. The Tenth Circuit reached a similar conclusion in cases where a promise for a conjugal visit and a promise of return of property did not materialize. *See Rodriguez*, 12 F.3d at 176 ("In light of the significant benefits Mr. Lopez did receive as a result of his plea agreement, including the avoidance of a possible death sentence, the alleged breach of a promise of a conjugal visit did not deprive the agreement of its voluntary character."); *Purkey v. Kansas*, 281 Fed. Appx. 824, 829 (10th Cir. 2008) ("The only breach alleged by Purkey was the government's failure to return certain photographs and tools. Nothing in the record suggests the government deprived Purkey of any of the plea agreement's other benefits. Because this breach is not material, we conclude jurists of reason would not find it debatable whether it is a constitutional violation.").[20] Accordingly, Claim 8 affords no basis for habeas relief.

---

"John Brunner" in New Mexico custody. *See* http://corrections.state.nm.us/offenders/search.php.

[20] *See also, e.g., United States v. Colacurcio*, 499 F.2d 1401, 1404 -1405 (9th Cir. 1974) (rejecting argument that "conditional" waiver of jury trial was breached when hospitalized codefendant was never able to later testify in part because "The 'unkept promise of the prosecutor' in *Santobello* has no counterpart in this case. Fault cannot be attributed to either the prosecutor or the judge. Hoffman's physical condition obviously was beyond the control of either the judge or the prosecutor."); *Commonwealth v. Dietrich*, 381 Mass. 458, 409 N.E.2d 1288, 1290-91 (Mass. 1980) ("Dietrich claims that he waived his right to a jury trial in reliance on the weakness of the government's case against him, and therefore his waiver was vitiated when the government's case became stronger by reason of Coyne's testimony. . . . Dietrich argues that it (was) perfectly clear to the Commonwealth prior to trial that it (would) be necessary to 'make a deal' with one of the defendants in order to secure convictions.' If it was perfectly clear to the Commonwealth, however, it was equally clear to the defendant. The defendant knew that shortly after the incident Coyne had given the police a statement inculpating all three of his codefendants and exculpating himself. Therefore, the probability that Coyne might strike a deal and decide to testify for the Commonwealth was an obvious consideration in deciding whether to waive a jury. The decision whether or not to waive the right to trial by jury is primarily 'a decision regarding trial strategy.' . . . 'In the end, the defendant must make an over-all estimate as to where he will fare better, before a judge or before a jury. If he goes to trial, he will presumably prefer to go to trial in the forum where he thinks his chances will be best.' H. KALVEN & H. ZEISEL, THE AMERICAN JURY, 28 (1966). The

### C.  Confrontation Clause – Use Of Officer Phillips'
### Preliminary Hearing Testimony

On the day of the incident, Officer Phillips wrote a short report about what he witnessed

and this document is Defendant's Exhibit F.  He was also interviewed by several different people

either that night or soon thereafter.  Two of the interviews were taped and transcribed – the

Hobbs Police Department interview and the prison supervisor's interview.  The transcribed

interviews are Defendant's Exhibits G and H.  The appointed attorney who was defense counsel

at the time of the preliminary hearing had a copy of the report when he cross-examined Officer

Phillips.  However, counsel did not have a copy of the transcribed interviews.  *See, e.g., Defense*

*Trial Exhibits F-H; Preliminary Hearing Transcript* at 28-30; *Exhibit H* at 5-4.

Except for Payne, Price and the victim, no one in the prison was in a position to see

exactly what happened in the cell.  Officers Flores and Phillips were the only potential witnesses

to the events that took place outside the cell.  But the prosecutor could not call Officer Phillips

to testify because he had suffered extensive brain damage in a motorcycle accident.[21]  Over

defense objection, Judge Lynch granted the prosecutor's motion to admit Officer Phillips'

preliminary hearing testimony under New Mexico Rule 11-804.  *See Record Proper* at 1027-28,

1097-1102; *Pretrial Hearing Transcript* at 16-29; *Trial Transcript* at 62-65.  The prosecutor played

_____

defendant will not be relieved of the consequences of his tactical decision where the circumstances which
are said to warrant relief were clearly foreseeable at the time of the waiver.  *See United States v. Conforte,*
624 F.2d 869 (9th Cir. 1980); *Wyatt v. United States,* 591 F.2d 260 (4th Cir. 1979); *United States v.
Colacurcio,* 499 F.2d 1401 (9th Cir. 1974); *United States v. Sadrzadeh,* 440 F.2d 389 (9th Cir. 1971).").

[21]   The prosecution contemplated calling codefendant Price and Officer Flores as witnesses, and
both were physically present and available to do so during trial, despite defense efforts to exclude Officer
Flores.  The prosecution rested without calling them, however, and the reasons it did so are not evident in
the record.  *See, e.g., Record Proper* at 867-69, 871, 1029-31, 1039-41, 1074-87; *Trial Transcript* at 226,
229; *Pretrial Hearing Transcript* at 29-45; *Voir Dire Transcript* at 11-14; 343-44.

the tape of Officer Phillips' preliminary hearing testimony and also admitted as State's Exhibit 16

a partial and uncertified transcript of that testimony for demonstrative purposes.[22]

For the purposes of this case, the Supreme Court precedent is clearly established –

admission of preliminary hearing testimony does not violate the Confrontation Clause if the

witness is "unavailable" and the defendant had a "prior opportunity" to cross-examine the

witness.  *Crawford v. Washington,* 541 U.S. 36, 59, 68 (2004).[23]  The state and federal evidentiary

rules governing the admission of preliminary hearing testimony are identical and closely parallel

---

[22]  The court reporter did not transcribe the tape during trial, so Officer Phillips' preliminary hearing testimony does not appear in written form in the official record.  Having listened to the preliminary hearing tape recording and compared it with Exhibit 16, there are some untranscribed portions and a few mistakes in Exhibit 16, but all of them are immaterial to the analysis above.

[23]  The Supreme Court's 2004 decision in *Crawford* was issued after Payne's conviction became final in late 2003 and, as such, does not apply retroactively on habeas review.  *See, e.g., Whorton v. Bockting,* 549 U.S. 406, ___, 127 S. Ct. 1173, 1184 (2007); *Stevens v. Ortiz,* 465 F.3d 1229, 1235 n.2 (10th Cir. 2006); *Brown v. Uphoff,* 381 F.3d 1219, 1227 (10th Cir. 2004).  If it did apply, however, it would not change the result in this case.  Preliminary hearing testimony is unquestionably considered to be "testimonial" hearsay, and the *Crawford* decision did not change the federal Confrontation Clause analysis for such testimony – unavailability and opportunity for cross-examination during the preliminary hearing, just as the preliminary hearing testimony at issue in *Ohio v. Roberts,* 448 U.S. 56 (1980).  *See Crawford,* 541 U.S. at 54 ("The historical record also supports a second proposition:  that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."); *id.* at 59 ("Our cases have thus remained faithful to the Framers' understanding:  Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."); *id.* at 61 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'"); *id.* at 68 ("Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required:  unavailability and a prior opportunity for cross-examination.  We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"  Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing"); *McKinney v. Bruce,* 125 fed. Appx. 947, 950 (10th Cir. 2005) ("Testimonial statements include . . . testimony at a preliminary hearing . . . .  The admissibility of these statements are now subject to the traditional common law test of unavailability and prior opportunity for cross-examination.").  The "unavailability" and "prior opportunity" test is the same test applied above is the same pre-*Crawford* precedent that the State court applied.

the constitutional inquiry.  That is, preliminary hearing testimony is admissible if the witness is unavailable and "the party against whom the testimony is now offered . . .  had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."  N.M. Rule 11-804(b)(1); FED. R. EVID. 804(b)(1).

Payne's federal claims are not precisely the same as those raised in the state proceedings, but one area of overlap focuses on the "prior opportunity" criterion.  Payne argues the lack of access to all of the statements prior to the preliminary hearing violates the Confrontation Clause because it rendered his attorney unable to effectively cross-examine Officer Phillips.[24]  In the counseled direct appeal, these inconsistencies identified were whether Officer Phillips:  (1) simply heard a "male voice" ask for the cell to be opened or whether he specifically heard either Payne or Price make the request; (2) saw Price and Payne standing outside the cell when the request was made or looked up to see them standing there after the request was made; (3) saw Payne leave the cell before he went to get the riot baton or after he got the riot baton; and (4) saw anything in Payne's or Price's hand after they left the cell.  *Exh. H* at 6-7.  Here, part of Payne's claim alludes to the same sorts of chronological/observational inconsistencies.[25]

---

[24]  *See Petition* at 5 ("At trial the judge . . . allowed pretrial testimony of Correctional Officer James Phillips to be played into the trial.  Phillips was unable to be present at trial . . . at prelim Petitioner was not afforded Phillips['] prior statements which further undermined confrontation"); *id.* at 12-13 ("Phillips gave two versions of the events with the differences being minor when compared but great when consolidated.").

[25]  *See Petition* at 12-13 ("Phillips['] statements vary slightly in that in one he saw two people exit the cell before he entered the control room and in the other statement he saw two people exit the cell after he entered and re-exited the control room.  (This would have also been clarified in the re-accountment of Price's testimony to Petitioner's counsel Gail Evans.)  The two critical points [defense counsel Jeff] Rein refused to address was first to ask Phillips if in fact both his versions were correct/accurate in that once he got to the center gate one person was exiting the cell and than after he returned to the control room retrieved the baton from a locked case and went back to the gate a second

Although the two-prong constitutional test for admission of preliminary hearing testimony is clearly established, and although the Supreme Court has come close, it has not yet established a bright-line rule that all preliminary hearing testimony is admissible because the mere opportunity for cross-examination will suffice.  Nor has it definitively settled what a constitutionally-sufficient "opportunity" to cross-examine entails.[26]

The most that can be said about the Supreme Court cases dealing with preliminary hearing testimony, is that they emphasize the fact of opportunity to cross-examine without undue restriction is key, rather than what actually transpired.  "[T]he Confrontation Clause provides [a

---

person exited the cell (the court adopted the version that both defendants exited the cell after Phillips retrieved the baton through Phillips's statements only give this version partial once as opposed to the four or five times he said it was before he got the baton.)  Counsel's duty is to clarify these issues by asking questions.") (certain punctuation also supplied for clarity).

[26]  *See, e.g., Roberts,* 448 U.S. at 70 ("We need not decide whether . . . the mere opportunity to cross-examine rendered the prior testimony admissible. . . . Nor need we decide whether *de minimus* questioning is sufficient, for defense counsel in this case tested Anita's testimony with the equivalent of significant cross-examination."); id. at 73, n.12 (concluding that *Mancusi* inquiry into counsel's cross-examination does not hold to the contrary because of the quote that follows); *Mancusi v. Stubbs,* 408 U.S. 204, 216 (1972) ("Since there was an adequate opportunity to cross-examine . . . at the first trial, and counsel for [defendant] availed himself of that opportunity, the transcript . . . bore sufficient 'indicia of reliability' and . . .  no constitutional error in permitting his prior-recorded testimony to be read to the jury"); *California v. Green,* 399 U.S. 149, 165-166 (1970) ("This Court long ago held that admitting the prior testimony of an unavailable witness does not violate the Confrontation Clause.  *Mattox v. United States,* 156 U.S. 237 (1895).  That case involved the testimony given at the defendant's first trial by a witness who had died by the time of the second trial, but we do not find the instant preliminary hearing significantly different from an actual trial to warrant distinguishing the two cases for the purposes of the Confrontation Clause. . . .  And in *Barber v. Page,* 390 U.S. 719, 725-26 (1968), although noting that the preliminary hearing is ordinarily a less searching exploration into the merits of a case than at trial, we recognized that 'there may be some justification for holding that the opportunity for cross-examination of a witness as a preliminary hearing satisfies the demand of the confrontation clause where the witness is shown to be actually unavailable. . .'  In the present case respondent's counsel does not appear to have been significantly limited in any way in the scope or nature of his cross-examination of witness Porter at the preliminary hearing."); *Barber v. Page,* 390 U.S. 719, 725-26 (1968) (case where state made no effort to transport witness who was available to testify, and at preliminary hearing defendant's attorney did not cross-examine the witness although attorney for a codefendant did so, recognizing that the Court may be justified in holding the opportunity to cross-examine at the preliminary satisfied the Confrontation Clause, the witness had not been shown to be unavailable).

defendant] only an opportunity for effective cross-examination, not cross-examination that is

effective in whatever way, and to whatever extent, the defense might wish.'"  *Barger v. Oklahoma,*

238 Fed. Appx. 343, 347 (10ᵗʰ Cir. 2007) (quoting *Kentucky v. Stincer,* 482 U.S. 730, 739

(1987)); *see also, e.g., Gilmore v. Taylor,* 508 U.S. 333, 349 (1993) (same, quoting *Delaware v.*

*Fensterer,* 474 U.S. 15, 20 (1985) (*per curiam*)); *United States v. Owens,* 484 U.S. 554, 559 (1988)

(same, quoting *Stincer, Fenster,* and *Ohio v. Roberts*).²⁷  Furthermore, the *Ohio v. Roberts* majority

specifically declined to address whether counsel's cross-examination during the preliminary

hearing "surmounts some inevitably nebulous threshold of 'effectiveness.'"  448 U.S. at 73, n. 12.

It

> h[e]ld that in all but such extraordinary cases, no inquiry into
> 'effectiveness' is required.  A holding that every case involving
> prior testimony requires such an inquiry would frustrate the
> principal objective of generally validating the prior-testimony
> exception in the first place – increasing certainty and consistency
> in the application of the Confrontation Clause.

*Id.*  As the Court later stated, "successful cross-examination is not the constitutional guarantee."

*Owens,* 484 U.S. at 560.

Under pre-*Crawford* caselaw, the use of preliminary hearing testimony does not violate

the Confrontation Clause where, as here, defendant's attorney is able to cross-examine the

witness, does so without restriction, and the trier of fact is aware of the discrepancies the defense

relies upon.  "Similar motive" under the evidentiary rules is not construed to require "identical"

---

²⁷ *Crawford* too only requires and emphasizes the "opportunity."  *See* 541 U.S. at 44-45, 55, 57-
59, 68; *see also Giles v. California,* ___ U.S. ___, 128 S. Ct. 2678, 2687 (2008) ("this Court decided in
*Crawford* . . . that the Confrontation Clause requires that a defendant have the opportunity to confront
the witnesses who give testimony against him, except in cases where an exception to the confrontation
right was recognized at the time of the founding.").

motive between cross-examination at a preliminary hearing and cross-examination at trial.[28]  I

---

[28]  *See, e.g., Owens v. Frank,* 394 F.3d 490, 503 (7th Cir. 2005) ("Maurice Owens appeared in open court, under oath, and in front of the defendant.  He identified the defendant as the person who had fired a shotgun at a door through which he had walked. Mr. Owens' counsel was able to cross-examine Maurice about the argument he and Mr. Owens had, the timing of the events and the basis for Maurice's knowledge.  Therefore, as in *Haywood,* the examination of Maurice allowed Mr. Owens to determine what Maurice claimed to have seen as well as the events that formed the basis of his testimony."); *Tapia v. Tansy,* 926 F.2d 1554, 1557 (10th Cir. 1991) ("A defendant has engaged in effective cross-examination if 'the jury had sufficient information to make a discriminating appraisal' of the relevant issue."); *United States v. Allen,* 409 F.2d 611, 613-14 (10th Cir. 1969) ("We believe that the test is the opportunity for full and complete cross-examination rather than the use which is made of that opportunity.  At the hearing before the United States Commissioner, the defendant and his counsel were confronted by the witnesses who testified under oath and were subjected, without limitation, to extensive cross-examination.  The extent of cross-examination, whether at a preliminary hearing or at a trial, is a trial tactic.  The manner of use of that trial tactic does not create a constitutional right. . . .  demeanor evidence is not an essential ingredient of the confrontation privilege . . . right of confrontation has been satisfied.  The defendant and the witnesses were brought face to face in a judicial proceeding. The witnesses were sworn and the opportunity for cross-examination was complete and adequate."); *United States v. McElhiney,* 85 Fed. Appx. 112, 114-15 (10th Cir. 2003) ("Rule 804(b)(1) does not require that the prior testimony be given in the context of identical charges.  *See, e.g., United States v. Salerno,* 505 U.S. 317, 326 (1992) (Blackmun, J., concurring) ("'similar motive' does not mean 'identical motive'"); *Murray v. Toyota Motor Distributors, Inc.,* 664 F.2d 1377, 1379 (9th Cir. 1982) (for former testimony to be admissible under Rule 804(b)(1), '[t]he motive need only be "similar," not 'identical'."); *Spindle v. Berrong,* 1993 WL 230114 at * 2 (10th Cir. 1993) ("guarantees of trustworthiness are found 'in the accouterments of the preliminary hearing itself.' . . . Thus, the law infers the indicia of reliability from the procedure; if the defendant is present, has an opportunity to cross-examine, and the witness is under oath, any statement is considered necessarily reliable.  The Court in *Roberts,* holding a preliminary hearing automatically affords the guarantees of trustworthiness necessary to comply with the Confrontation Clause, probably did not envision testimony from such an incredible witness serving the basis for a murder conviction.  Nevertheless, we are limited to consider whether defendant was present at the Article 32 hearing and was provided with the constitutional opportunity to meaningfully confront the witness.  As a matter of procedure, petitioner was afforded the constitutional minimum."); *see also Lewis v. Woodford,* 2005 WL 2643172 (E.D. Cal. 2005) ("as long as a defendant was given an *adequate* pre-trial opportunity to cross-examine, a witness' read or videotaped testimony at trial will not be precluded simply because all possible information was not supplied to counsel prior to a pre-trial deposition.") (emphasis original); *Watson v. White,* 1996 WL 617309 at ** 2-5  (N.D. Cal. 1996) ("the [test] for determining when incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause [is unavailability and indicia of reliability]. . . .  The Supreme Court reiterated that '[i]n *Green,* the Court found guarantees of trustworthiness in the accouterments of the preliminary hearing itself [and] Court further cited factors which indicate compliance with the Confrontation Clause requirements: . . . under oath; . . . represented by counsel . . . opportunity to cross-examine  . . . before a judicial tribunal, equipped to provide a judicial record of the hearings.'  These factors, the Court concluded, provided all that the Sixth Amendment demands: . . . 'similar motive' is a requirement under the rules of evidence, nor the Sixth Amendment.  The Supreme Court does not conduct a 'similar motives; inquiry in its Sixth Amendment analysis."); *Gainer v. Jeffes,* 1989 WL 14076 at **1-4 (E.D. Pa. 1989) (case where habeas

have found no Supreme Court authority to the contrary.  Finally, Confrontation Clause errors

are subject to harmless error analysis.[29]

The New Mexico Supreme Court rejected the Confrontation Clause claim holding that:

meeting the evidentiary rule criteria automatically satisfies the Confrontation Clause; the key lies

n opportunity for cross-examination, not how cross-examination was carried out; cross-

examination during the preliminary hearing was not restricted and defense counsel cross-

examined Officer Phillips "extensively;" and any error was harmless because Judge Lynch was

aware of the inconsistencies, and they did not alter the substance of the critical portion of Officer

Phillips' observations – Payne and Price entered the cell and exited the cell and Garcia was found

mortally wounded immediately thereafter.  *See Exh. H* at 5-12.  The decision is not "contrary to"

because it precisely parallels the above federal precedent.  Indeed, the state cases the New

---

petitioner asserted that counsel did not have two prior witnesses statements that contradicted preliminary
hearing testimony and "[b]ecause counsel was unaware of these statements, he could not cross-examine
Giddings concerning them."  Court rejected claim holding:  "preliminary hearing testimony was subject to
some procedural guarantees that ensure the reliability of former testimony: . . . under oath and testified
before a judicial tribunal; [defendant] was present at the preliminary hearing and represented by counsel;
and there was a judicial record of the hearings. . . .  Counsel did not probe . . . credibility by questioning . .
. . bias or possible motive to lie.  However, the Supreme Court has stated that where some
cross-examination of prior testimony has occurred there is no need for searching inquiry into its
effectiveness.").

[29] *E.g., Farrell v. Soares,* 211 Fed. Appx. 766, 776-77 (10th Cir. 2007) ("we may consider the
importance of the . . . testimony in the prosecution's case; whether the testimony was cumulative; the
presence . . . of evidence corroborating or contradicting the testimony of the witness on material points;
the extent of the actual cross-examination otherwise permitted; and the overall strength of the
prosecution's case. . . . If we are in grave doubt as to the harmlessness of the error . . . the [habeas]
petitioner must win.") (internal quotations and citations omitted; citing, among other cases, *O'Neal v.
McAninch,* 513 U.S. 432, 437 (1995), *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993); *Delaware v. Van
Arsdall,* 475 U.S. 673, 684 (1986), and *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)).

*Crawford* issued no decision about harmlessness.  *Crawford,* 541 U.S. at 42 n.1 (2004) ("The State
also has not challenged the Court of Appeals' conclusion . . . that the confrontation violation, if it
occurred, was not harmless.  We express no opinion on these matters.").

Mexico Supreme Court cited relied upon that precedent and the Tenth Circuit's decision in *Allen* cited in footnote 26. *See, e.g., State v. Gonzales,* 113 N.M. 231, 225–27, 824 P.2d 1023, 1027-29 (1992).

I also find that the decision about the extent of cross-examination and harmlessness are reasonable, regardless of whether I characterize the determinations as one of fact or law, and regardless of whether I review the issues independently. *See, e.g., House,* 527 F.3d at 1018-19 (defining "contrary to" and "reasonableness" inquiries under 28 U.S.C. § 2254(d)(1) regarding clearly established Supreme Court precedent and "unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2)).

The preliminary hearing was held in September 20, 1999, for both defendants.  Payne was personally present at the hearing, and he and Price were represented by their respective counsel. *See State's Trial Exhibit 17* (tape, appearances for the record).  Each defense attorney separately questioned Officer Phillips.  The judge imposed no restrictions whatsoever and the prosecutor made no objections during this questioning.  Taken separately, the questioning by Payne's attorney and Price's attorney were extensive.  Taken together, there is no room for argument about extent – while the prosecutor's questions lasted approximately fifteen minutes, together Defense counsels' questioning lasted approximately another hour.[30]  Both attorneys focused on testing Officer Phillips' recall of the events, particularly the precise chronology of events, the

---

[30] *See State's Trial Exhibit 16* at 9 (marking Tape 1 at "14.6" minutes when State stopped questions); *id.* at 9 (defense begins questioning around "14.6" minutes); *id.* at 21 (defense questions continue, marking Tape 1 at "33.4 minutes"); *id.* at 26 (defense questions continue, marking Tape 1 at "41.0" minutes); *id.* at 30-31 (defense questions continue, marking Tape 1 at "49.6" minutes and continuing for another page and a half of testimony before Tape 2 begins); *id.* at 45 (just before defense questions end, marking Tape 2 at "25.5" minutes).

length of events, his vantage point for observation, if he saw them throw anything after they left the cell, and one attorney specifically showed him his written report of the incident. *See State's Trial Exhibit 16* at 9- 46.

> As for harmlessness,  although Officer Phillips' preliminary hearing testimony was central to the State's case, I have no doubt that the asserted lack of cross-examination had no effect on Judge Lynch's guilty verdict. *E.g., Farrell v. Soares,* 211 Fed. Appx. 766, 776-77 (10th Cir. 2007) (and Supreme Court decisions cited therein for standard of harmlessness).  This is because Officer Phillip's report and the transcriptions that Payne wanted his attorneys to use to cross-examine his preliminary hearing testimony are all in accord on the material points that led to Payne's conviction and affirmance on direct appeal. That is, someone called out for the cell to be opened, Officer Flores complied, Payne and Price entered the cell, a commotion ensued, and Payne and Price left the cell and went back to their own cells at the end of the tier, while water and blood poured out of the cell and the victim lay dying of multiple stab wounds.[31]  Indeed, Payne does not challenge the sufficiency of the

---

[31]  In his limited remarks, Judge Lynch focused on his rejection of the defense argument that Payne was merely present at the crime Price carried out, saying in part:

> It's not easy to kill somebody in lock down. . . .  I don't have any doubt that you and Mr. Price planned this out carefully – you'd have had to plan out carefully.  You know, you were lucky that Carla Flores didn't know what she was doing and popped the cell door open . . . .  It's hard to get 50 stab wounds all over a body.  You know, I mean that's – whether it's 20 seconds or 50 seconds or 60 seconds or 90 seconds . . . if you look at the position of the wounds I'm firmly convinced that both you and Mr. Price were in there stabbing away at Mr. Garcia.  Even though the doctor . . . it's possible to think one person could do it, not when you consider the defensive nature of the wounds.  I mean the bottom line is, it's just not easy to kill somebody that's in lock down.  You can't do it.  It doesn't just happen.  It's planned, it's thought out, it's deliberate and I'll find that you are guilty.

evidence decision in his federal habeas petition.[32]  Thus, I would reach the same conclusion that the state court did about extensiveness and harmlessness even if I were reviewing the Confrontation Clause claim independently.

Both in his *pro se* state habeas petition and here, Payne raises the additional but related claims.  I will address one here and the rest below.  Payne asserts that because Officer Flores was available to testify live, the prosecution should have been required to call her instead of being allowed to use Officer Phillips' testimony.  *See Petition* at 13; *Exh. J*.  Judge Shamas rejected it in his catch-all conclusion that there were "a few new arguments of no merit."  *Exh. L* at 1.  The claim is without merit even if reviewed independently.

---

*Trial Transcript* at 262-63.

[32]   The New Mexico Supreme Court held that there was sufficient evidence to support a first degree murder conviction because

> [b]ased on reasonable inferences from the evidence, the trial court could have concluded that Defendant was involved in Garcia's death, or at the very least, that he helped or encouraged Garcia's death.  Officer Phillips saw Defendant and Price enter and then leave cell B-205 with their fists in the air and heard one of them saying 'white power."  When Officer Phillips entered cell B-205, he found inmate Garcia serious injured and dying.  The sprinkler system had been set off in cell B-205 which would support the inference that there was an attempt to wash away incriminating evidence such as fingerprints.  In defendant's own cell, the detective found scrub brushes and clothing soaking in soapy water.  The State argued that the scrub brushes were used to wash away blood from Defendant's clothes.  A large homemade weapon was found in cell B-205 and a smaller weapon was found down the hall areas to which Defendant and Price had access.  The detectives also found a book lying in the walkway with a string attached to it.  The State argues that the book may have been used to slide the smaller weapon from beneath the door of B-205 to where it was discovered near B-210.

*Exh. H* at 13-14.  The clothing soaking in soapy water and scrub "brushes" were found in Price's cell, and a scrub "pad" was found in Payne's cell.  *See Trial Transcript* at 59-61, 114-115, 133-34, 139.  Evidently, only Price had his fist in the air.  *See Defendant's Trial Exhibit G* at 4 ("as I looked up there . . . inmate Price had his fist in the air, you know, like he was rejoicing over something."); *State's Trial Exhibit* 16 at 4 ("they kind of had their arms in the air"); *id.* at 21 ("Who raised their hand and made a fist, if you know? [A]: That I noticed Mr. Price.").

Absent a constitutional violation, no habeas relief can issue.  *E.g.,* 28 U.S.C. §

2241(c)(3).  There is no constitutional requirement that the prosecution call every witness who

is available to testify.[33]  Furthermore, Officer Flores was not in the same position to see what

Phillips observed and did not leave the picket to go to the victim's cell.  Thus, the absence of her

testimony cannot have "so infected the trial with unfairness as to make the resulting conviction a

denial of due process."  *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (internal quotations to

*Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974) omitted); *see also Smith v. Phillips,* 455 U.S.

209, 219 (1982) ("[T]he touchstone of due process analysis . . . is the fairness of the trial, not the

culpability of the prosecutor.").

## D.  Ineffective Assistance of Counsel

It will take longer to set forth  the proper analytical framework for the ineffectiveness

claims than it will to discuss the disposition of the claims.

1.  Claims Against Trial Counsel Not Waived.

A preliminary question I must resolve is whether Payne's claims against trial counsel are

waived because that Judge Lynch granted him permission to represent himself prior to *voir dire*

and trial.  Given the unique circumstances of this case, I conclude they are not waived.

Judge Lynch concluded that Payne was entitled to represent himself under *Farretta v.*

*California,* 422 U.S. 806 (1975), but designated his attorneys to act as "standby" counsel under

---

[33]  *C.f., United States v. Allender,* 62 F.3d 909, 914 (7th Cir. 1995) ("As this court has said, "[t]he Constitution does not oblige counsel to present each and every witness that is suggested to him.  In fact, such tactics would be considered dilatory unless the attorney and the court believe the witness will add competent, admissible and non-cumulative testimony to the trial record."  *United States v. Balzano,* 916 F.2d 1273, 1294 (7th Cir. 1990).").

*McKaskle v. Wiggins*, 456 U.S. 168 (1984). *See Record Proper* at 974-75, 993-95. The grant of self-representation at that time was plenary, but only mentioned trial-type activities. Payne was to be "entitled to preserve actual control over the case he chooses to present to the jury . . . allowed to organize his defense, make motions, participate in *voir dire*, question witnesses, and address the court and the jury at appropriate points in the trial." *Id.* at 994 (internal quotations and citation omitted). Standby counsel was to "participate . . . outside the presence of the jury," would be permitted to "participate in the presence of the jury with Payne's consent," and was to assist with legal research and maintain certain documents. *Id.*

A later order confirmed this arrangement and expressly expanded Payne's self-representation to the penalty phase. *See id.* at 1004-1024, 1032-38, 1043-44A. That order was sealed in the state's records, but Payne attached it to his state postconviction petition. *Exh. J* (attachment "R" – "Order Confirming Defendant's Right to Self-Representation" filed 5/10/02). The order noted the nature of Payne's disagreements with counsel concerning the penalty phase: "disagreements . . . over how the guilt phase of the trial will be handled, and also over what type of mitigating evidence will be presented if this case proceeds to a penalty phase . . . Payne is adamant that his family members not be called as witnesses at the penalty phase." *Id.* at 1-2. Judge Lynch "denied" counsel's request to represent Payne during the sentencing phase "unless [Payne] requests their assistance in their role as standby counsel." *Id.* at 3.

By the time *voir dire* started, however, the arrangement Payne desired was different. He had filed a written stipulation "to letting my counsel represent me at *voir dire* and trial (guilt/innocence) but preserve my *pro se* at mitigation." *Record Proper* at 1047. At an *ex parte* hearing with Payne and his standby attorneys at the outset of *voir dire*, Judge Lynch permitted

34

this arrangement – Payne "may represent [him]self at the penalty phase" and counsel were to be "standby counsel at the penalty phase.  You *were* standby counsel for the whole thing, *and now you're standby counsel at the penalty phase*[,] if we get to the penalty phase and if Mr. Payne decides to represent himself."  *Voir Dire Transcript* at 8 (emphasis added); *see also id.* at 6-8.

In his last ruling, Judge Lynch thus revoked Payne's self-representation or "*pro se*" status and revoked defense counsel's standby status for the guilt phase of the proceedings.  He reinstated their relationship to that of defendant represented by appointed counsel unfettered by standby restrictions.  The distinction is key to determining whether challenges to standby counsel are waived under *McKaskle*.[34]  *See supra* note 4.  The "core of the *Faretta* right" is that "the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury."  *McKaskle,* 465 U.S. at 178.  If the *pro se* defendant consents to standby counsel's participation, either affirmatively or by failing to object to counsel's conduct during trial, he cannot later challenge the effectiveness of standby counsel.[35]  In contrast, the conduct of appointed counsel

---

[34] Judge Shamas noted that many of the ineffectiveness arguments had bee raised before his predecessor trial judges but did not discuss whether the claims were waived under *McKaskle.  See Exhs. K-L.*  He also suggested that the ineffectiveness claims were "addressed and rejected . . . by the New Mexico Supreme Court on appeal," *Exh. L* at 1, and this refers to the resolution of the Confrontation Clause issue, *see Exh. H* at 9.

[35] *See, e.g., McKaskle,* 465 U.S. at 182 ("Participation by counsel with a *pro se* defendant's express approval is, of course, constitutionally unobjectionable.  A defendant's invitation to counsel to participate in the trial obliterates any claim that the participation in question deprived the defendant of control over his own defense."); *id.* at 183 (*Faretta* does not require a trial judge to permit "hybrid" representation of the type Wiggins was actually allowed. . . . Once a *pro se* defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced."); *Simpson v. Battaglia,* 458 F.3d 585, 597 (7th Cir. 2006) ("The *Faretta* right and the appointment of standby counsel inherently conflict which, taking into account that hybrid representation is not required . . . supports the conclusion that there is no right to standby counsel.  Certainly there is no Supreme Court precedent clearly establishing such a right. . . . When standby counsel is appointed, the

for defendants who have not been granted self-representation, is analyzed under the *Strickland* standard.

Because Judge Lynch superceded Payne's agreement to allow standby counsel to conduct the guilt phase and, instead, revoked standby status for counsel during the guilt phase and bifurcated his prior grant of self-representation to only cover the penalty phase. As such, I cannot find that Payne waived his ineffectiveness claims.

2. Self-Representation

One set of Payne's "ineffectiveness" claims center around the short period of time between when Payne was granted permission to represent himself and when he choose to waive the jury and proceed with counsel representing him at a bench trial. He introduces the topic with a litany of complaints: that he and his attorneys had a "conflict of interest" because they were also representing him in the criminal case where he was charged with escape from the penitentiary; that he was not happy with their performance in that case either; that they disagreed over what motions to file in the murder case; that although Judge Lynch allowed him to proceed *pro se*, he also denied Payne access to a law library, an investigator and a paralegal; that while Judge Lynch appointed the defense attorneys as "stand by" counsel during this period,

---

primary concern is that appointed counsel does too much, so as to abrogate the *Faretta* right to self-representation, not too little. . . . Therefore, the inadequacy of standby counsel's performance, without the defendant's relinquishment of his *Faretta* right, cannot give rise to an ineffective assistance of counsel claim under the Sixth Amendment. . . . Simpson does not provide, nor could we find, a Supreme Court case holding standby counsel in a capital case should be treated any differently.") (citations omitted); *Lee v. Hines,* 125 Fed.Appx. 215, 217 (10th Cir. 2004) ("Even though Mr. Lee had the assistance of standby trial counsel, the magistrate judge's conclusion that no claim for ineffective assistance lies in this case is not reasonably debatable. . . . A defendant who chooses to represent himself and has the assistance of court appointed standby counsel cannot succeed in establishing ineffective assistance against such counsel when it is clear that the defendant maintained control of his defense.").

they "went on strike" and refused to assist him.  Payne thus alleges that when faced with the

"Hobsons' choice" of proceeding *pro se* or "accepting" his attorneys who were not structuring the

defense around every detail he desired, he was forced to acquiesce in their assistance.  *Petition* at

6.[36]

It seems to me that the ineffectiveness allegations are simply illustrations of the real claim

– that it was unconstitutional to require Payne to choose between two alternatives, neither of

which was to his complete liking.  I independently reject this claim.

As the Tenth Circuit has indicated in a factually similar case, I do not find that the

decision to forego self-representation and proceed with the strategy posed by appointed counsel

as presenting a constitutionally impermissible "Hobson's choice" between two constitutional

guarantees like the one the Supreme Court found in *Simmons*.  There, a defendant could not

testify and establish standing to make a Fourth Amendment challenge without the same

testimony being used at trial to establish guilt.  *See Simmons v. United States,*390 U.S. 377, 394

---

[36]  For the detailed claims, *see Petition* at 5 (Claim 2) (the fact that counsel in the escape case also represented him in the murder case is manifest conflict, plus counsel were ineffective in the first case by refusing to file a "Docketing Statement" and he challenged their effectiveness in the first case); *id.* at 6 (Claim 3) (Judge Lynch's appointment of standby counsel and counsel's lack of cooperation made self-representation nonviable); *id.* at 10-11 (Claim 7) (counsel filed some "pro forma" motions on Payne's behalf when he was proceeding *pro se,* but they did not present evidence or witnesses to support the motions and did not raise issues about preliminary hearing counsel or use of Officer Phillips' preliminary hearing testimony:  (a) ineffective assistance of preliminary hearing counsel in cross-examination of Officer Phillips; (b) Officer Flores should have been called to testify instead of using Phillips' preliminary hearing testimony; (c) a challenge to Officer Phillips' reliability and credibility due to his criminal history, discharge from military, discharge from Hobbs police force, or at least have investigate these discharges; and (d) preliminary hearing counsel should have been taken "off Petitioners case under the 'prior representation rule' or 'conflict rule."  Counsel also refused to file motions:  (a) for state to produce video tapes from the four surveillance cameras; (b) to challenge the "aggravator" that made this a capital charge; and  (c) to challenge "jurisdiction" of Lea County due to its contract with Wackenhut); *id.* at 14 (Claim 12) (Judge Lynch's appointment of standby counsel and counsel's lack of cooperation made self-representation nonviable).

(1968).  In the similar Tenth Circuit case, in contrast:

> Clemons's trial was set for August 7, 2000.  On July 14, 2000,
> Clemons informed the judge that he was unhappy with his
> court-appointed attorney and wished to have another attorney
> appointed. If he could not have another attorney, Clemons said
> that he wanted to represent himself.  The judge denied Clemons's
> request for new counsel, and the issue of self-representation was
> held over until July 21, 2000.  On that date, the judge explained at
> length the pitfalls of self-representation and advised Clemons
> against representing himself.  The judge specifically warned
> Clemons about the difficulty that he would have preparing for trial
> while in custody.  The judge advised Clemons that he could have
> counsel appointed at any time, but that having counsel brought
> back into the case at a later date would not be grounds for a
> continuance.  After listening to the judge's warnings, Clemons
> maintained that he wished to represent himself, and the judge
> concluded that Clemons had knowingly and intelligently waived
> his right to counsel.
>
> On August 7, 2000, the day his trial was set to begin, Clemons
> informed the court that he wished to waive his right to a jury trial.
> It is clear from the transcript of the proceeding that he did so
> because he believed that removing the case from the jury trial
> calendar would yield a continuance.  After getting an assurance
> from Clemons that he wished to waive his right to a jury, the judge
> set the case for a bench trial three weeks later.  When the day of
> his bench trial arrived, Clemons informed the court that he would
> not be representing himself, and that his court-appointed attorney
> would try the case.  His attorney requested a continuance, which
> was denied. Later that day, the judge found Clemons guilty on all
> counts.

* * * * *

> [Petitioner argues that] [s]ince he needed the continuance in
> order to effectuate his constitutional right to represent himself . . .
> the state court effectively forced him to choose between two
> constitutional guarantees in violation of *Simmons* . . .  We are not
> persuaded.

* * * * *

> . . . There is no constitutional impediment to a defendant
> bargaining away his right to a jury trial in exchange for something

of value otherwise unavailable.  *McMahon v. Hodges,* 382 F.3d 284,
291 (2nd Cir. 2004).

*Clemons v. McKune,* 183 Fed. Appx. 733, 736 (10th Cir. 2006).

If Payne is claiming that the "Hobson's choice" somehow made his decision to either to represent himself or to waive that decision "involuntary," I also reject the claim.  It is not necessary to expand the record further to include tapes of the two hearings where Payne voiced his disagreement with counsel to resolve these claims.[37]  A defendant does not have an absolute constitutional right to counsel of their own choosing, nor does a disagreement with counsel's trial strategy entitle a defendant to new counsel.[38]  Likewise, although a defendant proceeding *pro se*

---

[37]  Claim 3 asserts that because of his complaints about counsel's conduct, Petitioner wanted to fire his attorneys and proceed *pro se,* and Judge Lynch permitted him to do so, "but denied Petitioner access to a law library, investigator and paralegal and appointed the attorneys Petitioner just fired as 'stand by' counsel [and then] proceeded to go on strike and refused to assist Petitioner."  *Petition* at 6.  Judge Lynch therefore should have found standby counsel "in contempt for violating the order to be stand by counsel" – "all of these issues were addressed further at a hearing on the record 4-23-02 and 5-20-02" but there Judge Lynch did not "determine whether counsel was effectively representing Petitioner," and instead presented Petitioner with the "Hobsons' choice [of either proceeding] pro se or accept[ing] this counsel."  *Id.*  Payne asserts that he "stipulated to counsel under duress and voiced the same."  *Id.*  Claim 12 asserts that when counsel disagreed with the decision to allow him to represent himself, they became "adversary and Petitioner had no on[e] to effectively represent his complaints and concerns to the court" and Judge Lynch "refused to afford Petition access to a law library, investigator and paralegal so Petitioner could to the things his counsel had been refusing to do.  This effectively put Petitioner in the very predictiment (sic) he was attempting to get out of.  Than (sic) the court assigned the attorneys, just fired to be stand by counsel.  The court errored in not making Petitioners pro se representation viable or appointing different counsel."  *Id.* at 14.

[38]  Payne's claim may be based on the statement from the Tenth Circuit's decision in *Sanchez* that broadly quoted language from its *Padilla* case:  "A choice 'between incompetent or unprepared counsel and appearing *pro se*' is 'a dilemma of constitutional magnitude.' . . .  The choice to proceed *pro se* cannot be voluntary in the constitutional sense when such a dilemma exists."  *Sanchez v. Mondragon,* 858 F.2d 1462, 1465 (10th Cir. 1988) (quoting *United States v. Padilla,* 819 F.2d 952, 955 (10th Cir. 1987)), *overruled on other grounds, United States v. Allen,* 895 F.2d 1577 (10th Cir. 1990).  These cases analyze whether the decision to proceed waive counsel and *pro se* was voluntary, not whether the decision to relinquish that right was voluntary.  For the purposes of argument, I will assume that the inquiry is the same.  Crucial to the *Padilla* observation, however, was that the "question of voluntariness therefore turns on whether defendant's objections to present counsel are such that he has a right to new counsel" and that "'[t]o

under *Farretta* does not have a constitutional right to standby counsel, that is the preferred

practice and the trial court can appoint standby counsel over defendant's objection.  With

standby counsel, a defendant is not entitled to demand court-directed unrestricted access to a

prison law library or court-appointed services of an investigator and paralegal.[39]  Finally, Judge

_____

warrant a substitution of counsel, the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict.'"  819 F.2d at 955 (quoting McKee v. Harris, 649 F.2d 927, 931 (2nd Cir.1981), cert. denied, 456 U.S. 917 (1982)).  But *Padilla* specifically held that "defendant apparently found his appointed and retained counsel ineffective because they would not structure a defense as he directed.  However, his complaints about counsel do not constitute good cause for substitution of counsel.  The Sixth Amendment provides no right to counsel blindly following a defendant's instructions. . . .  Furthermore, there is no absolute right to counsel of one's choice."  *Padilla*, 819 F.2d at 955-56.  A number of subsequent unreported decisions emphasize the same.  *E.g.*, *United States v. Book*, 51 Fed. Appx. 819, 821-22 & n.2 (10th Cir. 2002) ("that [defendant chose to proceed pro se because his attorney] refused to pursue a 'chain of custody; argument does not make his choice involuntary in the constitutional sense [because under Padilla a defendant is 'not entitled to fire . . . and receive new counsel merely because he disagreed with [counsel's] strategic approach to the case' and fact that defendant believes because] those attorneys have been dismissed from my case.  It wouldn't be fair to have them represent me again' . . . fail[s] to suggest the existence of an irreconcilable conflict that would warrant the appointment of yet another attorney.");  *Rocha v. Price*, 51 F.3d 286 (10th Cir.) ("However, a lawyer's decision, in the exercise of his or her legal judgment, not to pursue a certain line of defense desired by the defendant does not constitute good cause. . . .  The right to counsel does not require that counsel blindly follow a defendant's instructions."), *cert. denied*, 516 U.S. 883 (1995).

[39]  *E.g.*, *Martinez v. Court of Appeal of California, Fourth Appellate Dist.*, 528 U.S. 152, 162 (2000) ("A trial judge may also terminate self-representation or appoint 'standby counsel' – even over the defendant's objection – if necessary.  [*Faretta*, 422 U.S.] at 834, n.46.  We have further held that standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not "seriously undermin[e]" the "appearance before the jury" that the defendant is representing himself.  *McKaskle*, . . . 465 U.S. at 187.")  *Faretta*, 422 U.S. at 835 n.46 ("a State may - even over objection by the accused - appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.");  *United States v. Taylor*, 183 F.3d 1199 (10th Cir. 1999) ("It is well established that providing legal counsel is a constitutionally acceptable alternative to a prisoner's demand to access a law library.  *See Lewis v. Casey*, 518 U.S. 343, 350-51(1996) . . .  In this case, the trial court provided Mr. Taylor with court-appointed counsel, thereby providing him with a constitutionally acceptable means to access the courts.  Despite this accommodation, Mr. Taylor nevertheless elected to waive counsel, but did so conditioning his *pro se* election on access to a law library.  The trial court, cognizant that the Oklahoma county jail contained no law library, ordered court-appointed counsel to stand by to provide Mr. Taylor expert legal assistance during his pro se representation.  In providing standby counsel, the trial court no doubt recognized the potentially excessive burden Mr. Taylor's demand

40

Shamas concluded that counsel was not ineffective and, for the reasons below, that decision is neither "contrary to" nor "unreasonable."

3. *Strickland,* Not *Cronic,* Governs.

Payne's petition contains numerous instances of alleged ineffectiveness and in two places he asserts that his attorneys did not provide any "adversarial testing" of the State's case. Payne's Claim 4, for example, concludes: "This is not about strategy, as trial Judge informed Petitioner he has no say in strategy, but simply about something a competent attorney would just do. Not just on this ground but throughout the entire case there was no adversarial element." *Doc. 1* at 8. Claim 5 contains the assertion that: "Counsel refused to present a defense at trial [saying] *the state had no case or evidence to support their case . . . .* Petitioner objected to this position entirely and was told . . . that the attorneys have sole say in strategy. Though what they did was not strategical it was incompetent – ineffective representation. Counsel presented no defense at trial." *Id.* at 9 (emphasis added). This raises the issue of whether the *Strickland v. Washington,* 466 U.S. 668, 689, 697 (1984) or *United States v. Cronic,* 466 U.S. 648 (1984) governs the ineffectiveness claims.

To prevail on a *Strickland* claim, the habeas petitioner must establish that: (1) his trial counsel's performance was deficient; and (2) his trial counsel's deficient performance prejudiced him. *See Strickland,* 466 U.S. at 687. *Cronic* was decided the same day as *Strickland* and discusses examples where the Court believed prejudice from counsel's ineffectiveness could be presumed.

---

for law library access would place on jail officials. While Mr. Taylor expressed some displeasure about Mr. Campbell sitting at counsel's table with him at trial, he nevertheless was fully aware legal assistance was available."); *Padilla,* 819 F.2d at 959 (""appointment of standby counsel is a preferred, though not mandatory, practice.").

The presumption may apply where "counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659 (emphasis added). To qualify for this exception, however, counsel must fail to oppose the State's case throughout the proceeding as a whole, and not just at certain points.[40]

That trial counsel primarily relied on the weaknesses in the prosecution's case rather than putting on an extensive defense does not convert a *Strickland* analysis to a *Cronic* analysis.[41] Therefore, I conclude that Payne's ineffectiveness claims should be analyzed under the above two-prong *Strickland* standard. The inquiry is highly deferential. Failure to meet either prong defeats an ineffectiveness claim, and if it is easier to dispose of a claim on the prejudice prong, that is the course the court should follow. *E.g.*, *Smith v. Robbins*, 528 U.S. 259, 286-87 & n.14 (2000); *Strickland v. Washington*, 466 U.S. 668, 689, 697 (1984). It is the course I follow here.

Payne's ineffectiveness claims fall into four broad categories: failure to effectively cross-

---

[40] *See Bell v. Cone*, 535 U.S. 685, 697 (2002) ("this is a difference of kind, not degree"); *see also Wright v. Van Patten*, ___ S. Ct. ___, 2008 WL 59980 at *3 ("it does not necessarily follow that mere telephone contact amounted to total absence or 'prevented [counsel] from assisting the accused,' so as to entail application of *Cronic*."). Because Payne's cite specific instances of claimed ineffectiveness, his arguments are thus "plainly of the same ilk as other specific attorney errors [that are] held subject to *Strickland*'s performance and prejudice components." *Bell*, 535 U.S. at 697-98; *see also, e.g., Snyder v. Addison*, 89 Fed. Appx. 675, 680-681 (10th Cir. 2004).

[41] *See, e.g., Hooper v. Mullin*, 314 F.3d 1162, 1175 (10th Cir. 2002) (the "record [did] not support the conclusion that defense counsel entirely failed to subject the prosecution's case to meaningful adversarial testing . . . [where] Defense counsel cross-examined the State's guilt-stage witnesses, made objections to the State's evidence, presented some evidence in Petitioner's defense, and made opening and closing arguments"), *cert. denied*, 540 U.S. 838 (2003); *Mitchell v. McKune*, 118 Fed. Appx. 410, 412 (10th Cir. 2004) ("By subjecting the government's witnesses to cross-examination and presenting a defense that would permit the jury to acquit Mitchell of murder, Mitchell's counsel did not entirely fail to test the prosecution's case. Therefore, the state court did not unreasonably apply *Strickland* or *Cronic* by declining to presume prejudice.").

examine Officer Phillips during the preliminary hearing; failure to investigate and/or present witnesses and evidence in defense; ineffectiveness relating to his decision to represent himself; and appeal.  Each category of claims fails to establish prejudice and/or the individual claims are without merit.

4. Cross-Examination During Preliminary Hearing

Payne asserts that the cross-examination counsel did conduct at the preliminary hearing was ineffective.  Evidently, during the hearing Payne requested his attorney to ask particular questions because here he asserts that counsel "refused to address several critical points *stating he did not want to put all the cards on the table.*"  *Petition* at 12 (emphasis added); *see also Exh.* J at 11.  The two specific instances Payne asserts his attorney did not address with Officer Phillips during the preliminary hearing are: (1) "the state was suggesting that Petitioner was in a particular area by design and Petitioner desired to prove through questioning that this was not the case," *Petition* at 12; *see also Exh. J* at 11-12; and (2) whether Officer Phillips "recalled making eye contact with Petitioner, who was at the top of the stairs, before he retrieved the baton," *Petition* at 13; *see also Exh. J* at 12.   Judge Shamas rejected these claims in his catch-all conclusion that there were "a few new arguments of no merit and/or which generally involve no more than hindsight doubts about reasonable trial strategies."  *Exh. L* at 1.  And, the substantive portion of his decision that rejects the ineffectiveness claims provides that:

> a review of this matter leave no doubt but that Petitioner was ably represented by his counsel.  It is clear that the Court (especially Judge Lynch) was also careful to assess the competency of counsel as this case progressed through pre-trial and trial proceedings. Appointed counsel is not compelled to pursue nonsense theories, and Judge Lynch told Petitioner several times that his counsel's reasonable trial strategies should be respected.  In summary,

> Petitioner's quarrel now with the adequacy of his counsel is truly
> unpersuasive in the light of all that has transpired in this case.

*Exh. L* at 2.

Judge Shamas' decision that these assertions fail the first *Strickland* prong is not contrary to or unreasonable.  Here, the decision not to ask those two questions was admitted trial strategy, and *Strickland* and other clearly established Supreme Court precedent emphasizes that trial strategy is effective conduct not to be lightly second-guessed on habeas review.  The burden is on Payne to overcome the presumption that counsel's conduct was strategic:

> Judicial scrutiny of counsel's performance must be highly
> deferential.  It is all too tempting for a defendant to second-guess
> counsel's assistance after conviction or adverse sentence . . .  A fair
> assessment of attorney performance requires that every effort be
> made to eliminate the distorting effects of hindsight, to reconstruct
> the circumstances of counsel's challenged conduct, and to evaluate
> the conduct from counsel's perspective at the time.  Because of the
> difficulties inherent in making the evaluation, a court must indulge
> a strong presumption that counsel's conduct falls within the wide
> range of reasonable professional assistance; that is, the defendant
> must overcome the presumption that, under the circumstances, the
> challenged action "might be considered sound trial strategy." . . .
> There are countless ways to provide effective assistance in any
> given case.  Even the best criminal defense attorneys would not
> defend a particular client in the same way.

*Strickland,* 466 U.S. at 689.[42]

---

[42] *E.g., Bell,* 535 U.S. at 698-99 ("respondent . . . must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly."); *Sallahdin v. Mullin,* 380 F.3d 1242, 1247-48 (10th Cir. 2004) ("'defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' [*Strickland,* 466 U.S. at 687] (internal quotations omitted); *see also Yarborough v. Gentry,* 540 U.S. 1, 8 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."); *Kimmelman v. Morrison,* 477 U.S. 365, 384 (1986) ("Counsel's competence . . . is presumed."); *Strickland,* 466 U.S. at 690 (stating "counsel is strongly presumed to have rendered adequate assistance

Moreover, independent review of the second prong shows that Payne also fails to establish prejudice.  In light of the above Confrontation Clause discussion, the two points he wanted Officer Phillips to establish would have had no effect on the admission of his testimony or the outcome of the case.  *See Strickland*, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").

5.  Investigation/Presentation of Defense

The defense theory was evident from counsel's lengthy arguments for a directed verdict and again closing statement – Payne was merely present at the scene of the crime because he was delivering laundry with Price and Price was solely responsible for the crime.  Defense counsel emphasized that:  there is reasonable doubt whether Payne was present during the crime; it was just as likely that one person committed the crime as two people, particularly given the logistics of the cell;  Phillips did not see a knife in Payne's hand at any time; it was implausible that anyone could have thrown a shank and towel 40 feet and have them land together in same spot; the prosecutor did not do DNA or fingerprint testing on physical evidence; and the prosecutor did not call Price or Officer Flores as witnesses, the only other two people besides Phillips who had seen anything and were thus asking for a conviction based on speculation.  *See Trial Transcript* at 206-17, 221-23, 241-54.

As emphasized in the *Cronic* section above, Payne disagreed with his attorney's trial strategy of challenging the prosecution's evidence.  Most of his ineffective assistance of counsel

and made all significant decisions in the exercise of reasonable professional judgment").

45

claims center around what he would have done differently, including: calling Price to testify to

unidentified "exculpatory" information;[43] more vigorously pursuing the notion that the knife

found toward the end of the walkway could not be attributed to Payne and could not have been

thrown there by him;[44] introducing evidence about a "third" knife found in the victim's cell;[45]

and emphasizing that no clothing was taken from Payne's cell and the clothing introduced at

trial was not taken from his cell.[46]

---

[43] In Claim 5, on the one hand Payne alleges that he tried to get counsel to meet with codefendant Price and his attorney "from the infancy of the case to no avail," and, on the other, admitting counsel did "finally interviewed" Price. He asserts that there is a fax of "Price's statement," but I have been unable to find this document in the voluminous state record. *See Petition* at 9.

[44] One of the Defense exhibits at trial was the statement by Sergeant S. Armstrong that when he responded to the scene as the officers were pulling the victim out of the cell and the medical personnel were tending to him, he turned around and saw a knife laying in the walkway. He was assigned to stand watch over it until it was processed about a half an hour later. *Defense Trial Exh. K.* Payne's premise is that this is untrue and that counsel should not have introduced the report without interviewing Armstrong. Payne maintains, instead, that the knife was not immediately noticed on the walkway right after the incident and, because it was not, the knife could not have been there right after the incident. Thus, neither he nor Price, who were seized immediately, could have placed it there – someone else did. No physical evidence ties the knife to Payne or the crime. He argues that counsel did not, but should have, interviewed: the four officers who handcuffed him immediately after the incident, and would say that was prior to the discovery of the knife; the officers who performed security checks immediately after the incident, who would say that they did not see the knife; the officers and medical personnel who were administering CPR to the victim, who would say that they did not see the knife; and the inmates on the second tier on the other side, who could see the walkway. He argues that counsel was ineffective in other ways with respect to the knife, such as: not presenting "pictures and video verify that the knife and rag were found on high ground with no water" and failing to have forensic testing done on the item; and not investigating the fact that the night before the incident Payne's cell was "shaken down" by a CERT team and no knife was found. *See id.* at 6-8 (Claim 4).

[45] In Claim 6, Payne asserts that, unbeknownst to defense counsel, Sergeant Buchanon found a third knife in the victim's cell, and that when Payne finally prevailed on his attorney to file a motion to have the prosecutor produce the knife, his attorneys did not support the motion "with evidence" or interview the Sergeant. *Id.* at 9-10. I have been unable to locate this motion in the Record Proper.

[46] This claim is very confusing and ultimately without foundation because both Payne and the New Mexico Supreme Court incorrectly attribute the source of clothing and scrub pads mentioned at trial. Payne asserts that they were found in a bucket in the victim's cell and the New Mexico Supreme Court stated that they were found in Payne's cell. The items were found in a bucket in Price's cell. *See id.* at 13-

Again, Judge Shamas' conclusion about the first *Strickland* prong is not contrary to or unreasonable since this was plainly a strategic choice made by counsel.  And, again, because the matters Payne wanted his attorneys to raise would have only had at most, an "isolated, trivial effect" on Judge Lynch's verdict, my independent review of the second prong shows that Payne also fails to establish prejudice.  *Strickland,* 466 U.S. at 696.  As the Tenth Circuit reasoned in a similar case:

> We admit this is a closer case than some since the State's only eyewitness was an accomplice; nonetheless, the prosecution did present strong circumstantial evidence of Mr. Foster's guilt.  Specifically, the prosecution placed Mr. Wiley in the Fosters' home at the time of his murder.  The investigating officers, forensic dentist and medical examiner described in detail the nature of the crime scene and injury to Mr. Wiley.  The jury certainly could conclude from the force with which Mr. Wiley was beaten, the fact the Foster's blood-stained sofa had been moved across the room and stood on end, and the removal and concealment of Mr. Wiley's body, that Mrs. Foster could not have acted alone in this crime while Mr. Foster was picking up a few groceries."

*Foster v. Ward,* 182 F.3d 1177, 1186 (10th Cir. 1999).

6.  Appeal

Payne's ineffective assistance of appellate counsel claims are conclusory and, thus, afford no basis for habeas relief.[47]  Alternatively, to the extent he wanted appellate counsel to raise the

---

14 (Claim 11 – claiming counsel was ineffective for not objecting to the items being "brought up at trial" and, evidently, not asserting at trial and on appeal that no clothing was found in Payne's cell); *supra note* 31 (citations to trial transcript re: clothing and scrub pad).

[47]  *See Petition* at 10-11 (Claim 7:  "Counsel did not present all issues on appeal (eg Motion to Suppress, Ineffective Assistance claim . . . ).  This was extremely self serving on their part and effectively a denial of Petitioners right of first appeal."); *id.* at 14 ("Appellate counsel was essentially in the same firm as trial counsel being that they are under the same Chief Public Defender and subject to his instruction and discipline.  Under the circumstances, with noted claims of ineffective assistance of counsel, the Chief Public Defender should have contracted a private attorney to prepare my appeal.  Though d[ue] to trial counsels utter failure to present a defense, perfect and appeal, foster issues for review, etc. no attorney

above claims against his trial attorneys, in light of the above disposition, there is no prejudice.[48]

## E.  Non-Cognizable Claims

Payne challenges certain findings of the New Mexico Supreme Court as allegedly improper.  Some of his factual allegations are not supported by the record.[49]  In any event, alleged errors on direct appeal does not provide a basis for habeas relief.  The federal habeas courts have no jurisdiction to sit as "'super state supreme courts.'"[50]  Rather than sitting "to correct errors of fact or to relitigate state court trials," the jurisdiction of a federal habeas court

---

would have been able to prepare a valid appeal.").  Conclusory assertions are insufficient to support habeas relief.  *E. g., Hatch v. Oklahoma,* 58 F. 3d 1447, 1469 (10th Cir. 1995) ("to warrant relief, or, as an initial matter, even an evidentiary hearing, a habeas corpus petitioner must allege sufficient facts to establish a constitutional claim") (internal quotations omitted), *cert. denied,* 517 U. S. 1235 (1996).

[48] *See Hamilton v. Miller,* 2006 WL 1444892 (W.D. Okla. 2006) (if trial counsel not ineffective, then habeas petitioner appellate claims fail where "Petitioner is . . . claiming . . . both trial counsel and appellate counsel were employed by the Oklahoma County Public Defender's Office, causing appellate counsel to be reluctant to raise trial counsel's alleged ineffectiveness on appeal.").

[49] *See Petition* at 14 (Claim 14:  "The Supreme Court of New Mexico violated Petitioners constitutional rights by relying on evidence not on the record for appeal/assuming facts"); *id.* at 15 (court held Phillips observed "hands" in the air when the record said it was "fists;" court held defense concession about Defense Exhibit F on appeal was erroneous; court held scrub brushes and clothing soaking in soapy water were in Petitioner's cell when it was in the victim's cell; court assumed that a string and book between cells B-202 ad B-203 were used to move the weapon, which is "physically impossible;" there was not "one shred of evidence" to support the finding that there is a "reasonable inference that Defendant and Price agreed to enter and leave cell B-205 together;" there was not forensic evidence on any evidence in the case, so there is no support for the finding that "both the weapons had remnants of blood on them;" the "Supreme Court members used excessive latitude in reviewing the record on appeal.  The rules of Appellate Procedure prohibit the court for 'assuming' or relying on anything outside the record and they admittedly did these things.  Errors of Facts.").

[50] *Bowser v. Boggs,* 20 F.3d 1060, 1065 (10th Cir.) (quote in parenthetical from *Smith v. McCotter,* 786 F.2d 697, 700 (5th Cir. 1986)), *cert. denied,* 513 U.S. 926 (1994); *see also e.g., DiGuglielmo v. Smith,* 366 F.3d 130, 137 (2nd Cir. 2004) (same quote in parenthetical from *Johnson v. Rosemeyer,* 117 F.3d 104, 110 (3rd Cir. 1997)); *Burrus v. Young,* 808 F.2d 578, 584 (7th Cir. 1986) (same, directly quoting *Skillern v. Estelle,* 720 F.2d 839, 852 (5th Cir. 1983)), *cert. denied,* 469 U.S. 873 (1984)); *Payne v. Janasz,* 711 F.2d 1305, 1310 (6th Cir.) (same, directly quoting *Martin v. Wainwright,* 428 F.2d 356, 357 (5th Cir. 1970), *cert. denied,* 400 U.S. 918 (1970)), *cert. denied,* 464 U.S. 1019 (1983).

"is limited to ensuring that individuals are not imprisoned in violation of the Constitution." *Thompson v. Oklahoma,* 2000 WL 14404 at * 6 (10th Cir.) (citing *Herrera v. Collins,* 506 U.S. 390, 400 (1993)), *cert. denied,* 530 U.S. 1265 (2000); *see also, e.g.,* 28 U.S.C. § 2241(c)(3); *id.,* § 2254(a).  In fact, the federal Constitution does not require States to provide appeals from criminal convictions.  *E.g., Lackawanna County Dist. Attorney v. Coss,* 532 U.S. 394, 402-03 (2002); *Evitts v. Lucey,* 496 U.S. 387, 393 (1985); *Abney v. United States,* 431 U.S. 651, 656 (1977).

If a State does create an appellate court system, however, the Supreme Court has held that the "procedures used in deciding appeals must comport with Due Process and Equal Protection." *Evitts,* 469 U.S. at 393.  Those procedures include a free transcript of the trial for indigents and effective assistance of counsel.  *Id.* at 393-94, 397.  But the Supreme Court has never held there is a constitutional right to a particular decision or a decision entirely free of misstatements by a state court on appeal.[51]

Moreover, even if any of Payne's allegations of error are supported by the Record, in light of the above analysis, each of the allegedly improper findings is immaterial to the New Mexico

---

[51]  *See Cleveland Surgi-Center, Inc. v. Jones,* 2 F.3d 686, 690-91 (6th Cir. 1993) ("Substantive due process has never been held to extend to wrong decisions of state courts and we will not be the first to so rule."), *cert. denied,* 510 U.S. 1046 (1994); *c.f., Bodine v. Warden of Joseph Harp Correction Center,* 2007 WL 534449 at * 1 (10th Cir. 2007) ("blanket attack on the manner in which the OCCA reviewed his direct appeal . . . does not state a cognizable claim for federal habeas relief"); *Dennis v. Mitchell,* 68 F. Supp. 2d 863, 876-77(N.D. Ohio 1999) ("central to our system is the general rule that state court determinations are not subject to appellate review . . . . The United States Supreme Court has consistently enforced this statute by giving preclusive effect to state court judgments [and] in *Allen v. McCurry,* the Supreme Court rejected the position that the Constitution requires an independent federal judgment on a question passed upon in state court. . . . With the AEDPA, Congress has made such an exception, albeit a narrow one."), *aff'd,* 354 F.3d 511 (6th Cir. 2003), *cert. denied,* 541 U.S. 1068 (2004).

Supreme Court's decision on sufficiency of the evidence, particularly since Payne does not

challenge sufficiency in his federal petition.

Wherefore,

IT IS HEREBY RECOMMENDED THAT the § 2254 petition be denied and this

action dismissed.

THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.

_____
UNITED STATES MAGISTRATE JUDGE